IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CASE NO. 4:20-CV-60-M

TERESA PRITCHARD as          )
Administrator of the Estate  )          D-E-P-O-S-I-T-I-O-N
of Cedric D. Pritchard,      )
                             )                  OF
            PLAINTIFF,       )
                             )          AARON M. MOBLEY
      V.                     )
                             )
AARON M. MOBLEY, in his      )
individual capacity, and     )
CITY OF WASHINGTON,          )
                             )
            DEFENDANTS.      )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ON OCTOBER 19, 2020, AT THE LAW OFFICES OF RODMAN, HOLSCHER,
PECK & EDWARDS, PA, 320 NORTH MARKET STREET, WASHINGTON, NORTH
CAROLINA.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:  MR. CARLOS E. MAHONEY
                    GLENN, MILLS, FISHER & MAHONEY, PA
                    404 HUNT STREET, SUITE 100
                    DURHAM, NORTH CAROLINA 27701

                    MR. SEAN P. CECIL
                    EDELSTEIN & PAYNE
                    315 EAST JONES STREET
                    RALEIGH, NORTH CAROLINA 27601


FOR THE DEFENDANTS: MR. CLAY A. COLLIER
                    CROSSLEY, MCINTOSH, COLLIER, HANLEY
                    & EDES, PLLC
                    5002 RANDALL PARKWAY
                    WILMINGTON, NORTH CAROLINA 28403

—

Carolina Court Reporters, Inc.
105 Oakmont Drive, Suite A
Greenville, North Carolina 27858
252-355-4700 800-849-8448 FAX 252-355-4707

6

1          AARON M. MOBLEY, BEING BY ME FIRST DULY AFFIRMED TO

2     SPEAK THE TRUTH, DEPOSES AND SAYS:

3          ON EXAMINATION CONDUCTED BY MR. CARLOS E. MAHONEY:

4          Q.   Thank you, sir.  Officer Mobley, as you heard, my

5     name is Carlos Mahoney.  Sean Cecil and I represent the estate

6     of Cedric Pritchard in this lawsuit that's been filed against

7     you --

8          A.   Yes.

9          Q.   -- and the City of Washington.  I'm gonna ask you

10    some questions today.  I'll need for you to give verbal

11    responses to everything I ask.  Is that okay?

12         A.   Yes, sir.

13         Q.   If you do not understand one of my questions, just

14    let me know, and I'll try to rephrase it.

15         A.   Okay.

16         Q.   If you need to take a break, at any point, just say

17    something, we'll go off the record.  Okay?

18         A.   Yes, sir.

19         Q.   All right.  Please state your full name for the

20    record?

21         A.   Aaron Michael Mobley.

22         Q.   And I don't need to know your specific address, but

23    where do you live?  What city --

24         A.   Bath, North Carolina.

25         Q.   Okay.  How long have you lived in Bath?

1    A.    Almost a year.

2    Q.    Okay.  Where did you live before that?

3    A.    Washington.

4    Q.    And how long had you lived in Washington?

5    A.    My whole life.

6    Q.    What led you to move out to Bath?

7    A.    My wife's family lives out there.  They have a farm.

8    Q.    So more land?

9    A.    Yeah.

10   Q.    All right.  Are you currently employed?

11   A.    Yes, sir.

12   Q.    Who are you employed by?

13   A.    City of Washington.

14   Q.    And what is your position?

15   A.    Senior Patrol Officer for the Police Department.

16   Q.    And is that the same position that you had at the

17   time of the shooting in this case?

18   A.    Yes, sir.

19   Q.    All right.  Tell us your date and place of birth?

20   A.    I was born in Washington, January 10th, 1986.

21   Q.    How old are you currently?

22   A.    34.

23   Q.    That would make you 32 when the shooting occurred?

24   A.    Yes.

25   Q.    And it sounds like you're born and raised in -- in

8

1   Washington.

2       A.   Yes, sir.

3       Q.   And, just for the record, you're a white male,

4   obviously.

5       A.   Yes, sir.

6       Q.   What is your height and weight?

7       A.   6'3, 225.

8       Q.   Were you approximately the same weight back in

9   October of 2018?

10      A.   Yes, sir.

11      Q.   Do you have a dominant hand?

12      A.   Left --

13      Q.   Are you left handed?

14      A.   Left handed.

15      Q.   And you're married?

16      A.   Yes, sir.

17      Q.   Any children?

18      A.   Two.

19      Q.   How old are they?

20      A.   Four and three.

21      Q.   Just starting to get a little sleep.

22      A.   Yeah.

23      Q.   Before this marriage, were you married before?

24      A.   Same girl.

25      Q.   Okay.  So, just one marriage --

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858
Carolina Court Reporters, Inc.
Greenville, North Carolina

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 4 of 82

1      Q.   -- in your professional career?

2      A.   No, sir.

3      Q.   Do you have any intentions to go to a different law

4  enforcement agency?

5      A.   No, sir.

6      Q.   Do you want to remain with the City of Washington as

7  long as you can?

8      A.   Yes, sir.

9      Q.   Apart from the City of Washington, did you apply

10  anywhere else?

11      A.   No, sir.

12      Q.   And the City offered you a job; is that correct?

13      A.   Yes, sir.

14      Q.   Let me show you -- oops.  Let me show you what I've

15  marked as Exhibit [3].  Is Exhibit [3] your conditional offer

16  of employment, along with your BLET certificate, your

17  probationary certification from Education and Training

18  Standards, and the oath that you took as a law enforcement

19  officer?

20      A.   Yes.

21      Q.   And your offer of employment was dated May 2, 2008;

22  is that right?

23      A.   The offer, I signed it 5/2/08.

24      Q.   May 2, 2008.

25      A.   Yes.

1  Q.   And were you, in fact, hired by the Chief of Police

2  at that time?

3  A.   Yeah, this -- the conditional offer, you're not

4  technically hired --

5  Q.   Okay.

6  A.   -- till you meet all the criteria.  That's just

7  their conditional.

8  Q.   It's extending an offer.

9  A.   Yes, sir.

10  Q.   And, then, once you satisfy those conditions --

11  A.   Yes, sir.

12  Q.   -- you have a full-time job.

13  A.   Yes, sir.

14  Q.   And during that conditional time period, what would

15  you have been doing?

16  A.   I was still going to BLET, so I was having to come

17  in and read policy and do -- fill sandbags and move sandbags

18  and destruct patrol cars, just random things until I

19  graduated.

20  Q.   Okay.  Were they paying you something during that

21  time period?

22  A.   Yes, they were paying me.

23  Q.   Okay.  And, then, you actually met all of these

24  conditions; correct?

25  A.   Yes, sir.

1    Q.   And they gave you a full-time position?

2    A.   Yes, sir.

3    Q.   Your BLET certificate is dated July 8, 2008.

4    A.   Yes, sir.

5    Q.   And you took that over at Beaufort County Community

6  College.

7    A.   Yes, sir.

8    Q.   When you took BLET, how many officers were in the

9  class with you?

10    A.   We started with 16, graduated 12.

11    Q.   And out of those 12 who graduated, how many of them

12  worked with you at the City of Washington?

13    A.   Five.

14    Q.   Are those five officers still employed?

15    A.   No, sir.

16    Q.   Were any of the five officers employed as of October

17  21 of 2018?

18    A.   No, sir.  Back up.  Corey Rogerson may have been.

19  He left us somewhere around that time to go to the Highway

20  Patrol Academy.

21    Q.   Okay.  And, then, your probationary certification

22  looks like it was approved on July 14, 2008; do you see that

23  date there?

24    A.   This one?

25    Q.   Yes, sir.

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

Carolina Court Reporters, Inc.
Greenville, North Carolina
Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 7 of 82

1      A.    I've got July 13.  Oh, yeah.  July 14, '08.

2      Q.    Since receiving a probationary certification, have

3  you received a permanent certification as a law enforcement

4  officer?

5      A.    Yes, sir.  You get your probation till you -- one

6  year and then you get your -- your general.

7      Q.    And you've maintained that ever since?

8      A.    Yes, sir.

9      Q.    All right.  All right.  And then the last page of

10  the exhibit is the oath of office, and your signature appears

11  there; is that accurate?

12      A.    Yes, sir.

13      Q.    And this is dated July 16, 2008.

14      A.    Yes, sir.

15      Q.    Have you received your immediate --

16      A.    Yes, sir.

17      Q.    -- law enforcement certification?

18      A.    Yes, sir.

19      Q.    I'm sorry I said immediate.  I meant intermediate.

20      A.    Um-huh, yes.

21      Q.    And when was that?

22      A.    Probably '15, '16, 2015, 2016, somewhere around

23  there.

24      Q.    Where did you take classes for the intermediate

25  certification?

28

1   sign up, and we work it.

2       Q.    All right.  Back in October of 2018, how many

3   officers were employed on each shift?

4       A.    Four to five a shift.

5       Q.    And tell me what rank those officers were?

6       A.    Typically, you have a sergeant, a corporal, and two

7   to three patrol officers.

8       Q.    How were the officers assigned throughout the City?

9       A.    We have four zones.  One officer per zone and, then

10  -- if you've got four officers, the supervisors are taking a

11  zone, if you've got five officers, the sergeant's not taking a

12  zone.

13      Q.    How about you, which zone were you typically

14  assigned to back in October of 2018?

15      A.    I was split shift, that's why I was noon to

16  midnight, so I kind of -- I really -- like toward the end of

17  the shift and the beginning OF the shift, I would work and if

18  somebody got a call like 5:30, I would take care of it.  That

19  way, they didn't have to stay past 6:00 to handle it, and I

20  could -- and I kind of floated around and worked everywhere.

21      Q.    Okay.  Who did you customarily work with?

22      A.    At that time, I was working for Sergeant Spinner's

23  shift, and I can't remember who the other sergeant was back

24  then.  But, Spinner was working that day.

25      Q.    So, Sergeant Spinner was your direct supervisor?

1    A.    Yes, sir.

2    Q.    How about the corporal, who would that have been?

3    A.    That was Ruben Hassell.

4    Q.    And would Corporal Hassell have been a supervisor

5  for you, too?

6    A.    Yes, sir.

7    Q.    And, then, the other officers that you typically

8  worked with, who were they?

9    A.    It was Lisa Harkley and Daniel Folk that was that

10  shift that day.

11    Q.    How long have you worked with Sergeant Spinner?

12    A.    He started in '12.

13    Q.    And what is Sergeant Spinner's race?

14    A.    He's white.

15    Q.    A white man?

16    A.    Yes, sir.

17    Q.    And, then, Corporal Ruben Hassell, how long have you

18  worked with him?

19    A.    He was here when I started in '08 and he retired in

20  '19.  He was a black male.

21    Q.    Okay.  Officer Harkley?

22    A.    She started in 2009, 2010, she's a black female.

23    Q.    And Officer Folk?

24    A.    Folk started 2015, maybe; he's a white male.

25    Q.    Were all these individuals working on the shift with

1    you on October 21 --

2        A.    Yes.

3        Q.    -- of 2018?

4        A.    Yes.

5        Q.    Was anyone else working on your shift that day?

6        A.    No, sir.

7        Q.    I've seen some references to a -- is it Detective

8    Dickinson?

9        A.    Yes, sir.

10       Q.    Is it Jessie Dickinson?

11       A.    Yes, sir.

12       Q.    And under what circumstances did you work with

13   Detective Dickinson?

14       A.    That day?

15       Q.    In general.

16       A.    I worked narcotics with him for a month and a half

17   prior to the incident.  Then, we got short on the street and

18   they pulled me back to patrol.

19       Q.    Okay.

20       A.    And he was -- I think he was the on-call detective

21   that weekend, which he doesn't work on Sundays, if he's on

22   call.

23       Q.    And when you say on call, does that -- does that

24   mean that he's called to duty if an incident arises and more

25   manpower is needed?

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 11 of 82

1    Q.   All right.  I'd asked you about who you worked with.

2  Tell me about the chain of command going above your sergeant.

3  How was that in October of 2018?

4    A.   Captain Broadwell was the captain, so, he's the next

5  one up on the rung and, then, the Chief, Stacy Drakeford.

6    Q.   I'm sorry.

7    A.   Then the Chief.

8    Q.   Okay.  So, Chief Drakeford would have been above

9  Captain Broadwell?

10    A.   Yes, sir.

11    Q.   And, then, below him, would be the sergeants?

12    A.   Yes, sir.

13    Q.   And how often would you interact with Captain

14  Broadwell?

15    A.   When I saw him at work.

16    Q.   Did he respond to calls, ever?

17    A.   He did not; he doesn't.

18    Q.   Okay.  I assume the Chief worked primarily in an

19  office setting?

20    A.   Yes, sir.  They will, if -- very few and far between

21  that a captain or the Chiefs out, but it's every now and then,

22  they will, but --

23    Q.   Are they typically --

24    A.   Not typical.

25    Q.   Are they typically Monday through Friday?

1     A.    Yes, sir.

2     Q.    All right.  And, looking back at your time records

3  after the shooting occurred, were you placed on administrative

4  leave?

5     A.    Yes, sir.

6     Q.    And do you know why you were placed on

7  administrative leave?

8     A.    For the shooting.

9     Q.    Is that -- is that just standard protocol?

10    A.    Yes, sir.

11    Q.    Okay.  And how long were you on administrative leave

12  for?

13    A.    Almost a year.

14    Q.    What did you do during that year?

15    A.    Sat at the office.

16    Q.    Was there another officer who took your position

17  doing patrol work?

18    A.    I have no clue.

19    Q.    Okay.  You say sat at the office.  I mean,

20  literally, just sitting there for eight hours a day or ten

21  hours a day?

22    A.    Every day, yes.

23    Q.    That sounds a bit miserable.

24    A.    Yes, sir.

25    Q.    Do you remember when you got off administrative

1  this case where you encountered an individual during a traffic

2  stop and the individual had a gun?

3      A.  Yes, sir.

4      Q.  And how many times has that happened?

5      A.  Five, I've probably got five guns off traffic stops

6  prior to that.

7      Q.  Okay.  And tell me what type of situations those

8  were?

9      A.  A lot of times, it's searching the car for dope,

10 find a gun, or they tell you about the gun.  'Cause I had one

11 the day before, he told me about the gun 'cause he knew I was

12 gonna find it.

13     Q.  Okay.  In any of those incidents, did the person

14 actually have the gun in their hand?

15     A.  No, sir.

16     Q.  Is this the only case that you've ever dealt with

17 where the individual had a gun in his hand?

18     A.  It's the only time I've had a case where somebody

19 pointed a gun at me, yes.

20     Q.  How about a case where someone did not necessarily

21 point the gun, but they had a gun in their possession?

22     A.  Not in their hand, no, sir.

23     Q.  Okay.  It was just somewhere in the car?

24     A.  Yeah.

25     Q.  I'm gonna show you Exhibit [15].  Exhibit [15] is

1  you'll see a light on and whether it's -- if you have to put

2  it back in the cradle to resync it.  It's just -- they have a

3  problem a lot of times.

4      Q.   How long had the problem existed with the body mics?

5      A.   Since I started --

6      Q.   All right.

7      A.   -- we've had issues with body mics syncing.  We're

8  on about our third or fourth brand.

9      Q.   And your body-worn camera, would you have had that

10  with you?

11      A.   Yes.

12      Q.   And --

13      A.   That's on the chest.

14      Q.   On the chest.

15      A.   Yes.

16      Q.   How long have you used a body-worn camera?

17      A.   I think we started in 2015 or 2016.

18      Q.   Have you had any issues with those?

19      A.   No, they've -- they've been pretty decent for --

20  they're cheap, but they've been pretty good.

21      Q.   Do you have to charge them every evening?

22      A.   They would last about two shifts.

23      Q.   And tell me how they're activated?

24      A.   They're on standby mode all the time.  And, then, to

25  activate it, you've got to hold a button down for a few

1   seconds, 'cause it's got to come out of standby mode, power

2   up, and then realize it want -- you want it to record and,

3   then, it will record. If you just press it, nothing, it's

4   just gonna come on, but it won't record. So you've got to

5   hold it down.

6       Q.   You actually hold the body camera --

7       A.   There's a button on the side, you've got to hold it

8   down. It's got to power up and then know that you want to

9   record. Just clicking it won't do anything.

10      Q.   On October 21 of 2018, what side would you have had

11  your service weapon?

12      A.   Left.

13      Q.   And, so, when you drew, you would have drawn it with

14  your left hand?

15      A.   Yes, sir.

16      Q.   Would you typically carry anything in your right

17  hand, if you had drawn your weapon?

18      A.   If I draw my weapon, both hands are gonna go on the

19  gun.

20      Q.   Okay.

21      A.   If -- if feasible. If I can get two hands on it,

22  I'm gonna get two hands on it.

23      Q.   Okay. I'm gonna show you Exhibit [16]. Here you

24  go. Is Exhibit [16] the City of Washington's use of force

25  policy that was in effect when the shooting occurred?

1      A.   No.

2      Q.   How about listening to the audio from your interview

3  with Captain Broadwell?

4      A.   I've listened to some of it.

5      Q.   Okay.

6      A.   It wouldn't pull up on my phone, so I tried to

7  listen to it at work a little bit.

8      Q.   Have you done any other interviews?

9      A.   No, sir.

10     Q.   Have you reviewed the videos from the in-car camera

11  that you had?

12     A.   I've briefly saw it, I have not had a chance to

13  actually watch it.

14     Q.   Okay.  When did you briefly see it?

15     A.   When I come back to work on administrative leave and

16  it happened so fast that I didn't even get to see it.  So I

17  haven't the chance to watch it and review it.

18     Q.   Who showed it to you?

19     A.   Sergeant McDuffie.

20     Q.   Sergeant McDuffie?

21     A.   Yes, sir.

22     Q.   And what was this context in which you saw it?

23     A.   Just to see it.  I mean, of course, I wanted to see

24  it, but I didn't even get a chance to really see it, because,

25  by the time I realized it was over with, it was like two

AARON M. MOBLEY

1 seconds, and that's it. I hadn't had a chance to like sit

2 down and watch it.

3     Q. And you're referring to the actual sequence of

4 events from Mr. Pritchard getting out of the car and being

5 shot?

6     A. Yeah, from the time he got out, you see the gun, to

7 the time I shoot is probably two seconds or less.

8     Q. Okay. It goes by pretty quickly on the video.

9     A. Yes, sir.

10     Q. When you watched it with Sergeant McDuffie, did

11 y'all slow it down?

12     A. No.

13     Q. Have you wanted to watch it since then?

14     A. Not really. I mean, if I wanted to, I'm sure they

15 would have let me, but I hadn't even asked to see it.

16     Q. And did you watch it in Sergeant McDuffie's office?

17     A. Yes, sir.

18     Q. Was anyone else present?

19     A. No, sir.

20     Q. And did he ask you any questions about what happened

21 or why you did what you did?

22     A. No, sir.

23     Q. How about your body camera video; have you see that?

24     A. No.

25     Q. Have you asked to view it?

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1    A.    No, sir.

2    Q.    And with regard to the body camera video, do you

3    recall that you did not activate it until after the shooting?

4    A.    That's correct.

5    Q.    And why is it that you did not activate it sooner?

6    A.    I didn't have time.

7    Q.    Would you have activated it, if you had time?

8    A.    Absolutely.

9    Q.    Okay.  And where or when would you have activated

10   it, if you had time, under those circumstances?

11   A.    Once I knew the traffic stop was gonna happen,

12   'cause he kind of forced my hand on speeding up the process

13   when he whipped it to the left and pulled up to the curb and

14   stopped himself.

15   Q.    Okay.  All right, to prepare for this deposition,

16   did you talk with anyone, other than your attorney?

17   A.    No, sir.

18   Q.    Have you discussed the case with anyone at the City

19   of Washington to prepare for this deposition?

20   A.    No, sir.

21   Q.    Apart from you interviews with the SBI agent and

22   Captain Broadwell, have you discussed the case with anyone

23   else, other than your attorneys?

24   A.    I mean, people ask all the time, or did all the

25   time.  Everybody and their brother wants details and they know

1    -- they're like, I know you can't talk about it, but --

2    they're fishing.  But a lot of people -- I mean, I haven't

3    told nobody more than the District Attorney has told

4    everybody.  I mean, he was detailed, play by play.  So, I'd

5    say that he -- he spilled the beans on everything.

6        Q.   Were you interviewed by the District Attorney?

7        A.   No, sir.

8        Q.   And the DA, at the time, was Seth Edwards?

9        A.   Seth Edwards, yes, sir.

10       Q.   Is he still the DA?

11       A.   Yes, sir.

12       Q.   Have you ever had any one-on-one interactions with

13   DA Edwards?

14       A.   No, sir.

15       Q.   How well do you recall the events on October 21 of

16   2018 involving Cedric Pritchard?

17       A.   Very well.

18       Q.   Let's talk about Mr. Pritchard.  Did you know him

19   before that day?

20       A.   I knew his name.  I could tell you who he was when I

21   saw him, but that's it.

22       Q.   When you say you knew his name, how did you know his

23   name?

24       A.   Just from working at the Police Department.

25       Q.   Okay.  And you said you could tell who he was if you

87

1   saw him.

2      A.   Yes.

3      Q.   And tell me how that occurred that you would

4   recognize him if you saw him?

5      A.   From working.

6      Q.   Did you ever have any direct involvement with him

7   before the shooting?

8      A.   No, sir.

9      Q.   Any personal interactions with him before you became

10   a law enforcement officer?

11      A.   No, sir.

12      Q.   And it sounds like no personal interactions with him

13   after you became a law enforcement officer, before this

14   shooting?

15      A.   No, sir. I don't think I've ever dealt with him on

16   an incident either directly or indirectly. I don't even think

17   I've ever been on a scene with him, as far as dealing with

18   him.

19      Q.   All right. Is there anything else that you knew

20   about Mr. Pritchard before this shooting took place?

21      A.   Yes, sir.

22      Q.   Okay. Tell me what it is that you knew about him.

23      A.   The Friday before, so that would be the 19th, I

24   guess, he was a alleged suspect in an armed robbery at 7th and

25   Market. The guy described him, a green hoodie. We get there,

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858
Carolina Court Reporters, Inc.
Greenville, North Carolina

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 21 of 82

1   and he's the only one with a green hoodie, he was in the yard.

2   The victim won't being real cooperative about it.  I dealt

3   with somebody else at the scene that had some marijuana and we

4   -- I don't believe we addressed Cedric, period.  And, then, he

5   was in a shootout the Saturday night before, and that's on

6   Facebook live video.  So, he -- he's in a shootout on the

7   internet on video and then the next day -- the next Saturday,

8   I also saw him that Saturday during that foot chase with that

9   sex offender, spoke to him then in passing, asked him why he

10   robbed the guy the night before, and he said he didn't, he

11   said, I don't know what you're talking about, and I just kept

12   -- I just -- I had the sex offender guy, and I was just

13   bluffing him and we both -- it was just casual.  He knew we

14   didn't have nothing on him, and I knew we didn't have nothing

15   on him, and he was at another guy's house named Shooter.  Two

16   blocks from here is where that happened.  And that's all the

17   -- that weekend.  Before that, I don't believe I've ever dealt

18   with him.

19       Q.   Is that the only time you've ever had any

20   conversation with him?

21       A.   I believe so.

22       Q.   And it was limited to you bluffing and him saying --

23       A.   Um-huh.

24       Q.   -- I don't know anything about what you're saying?

25       A.   I mean, I wasn't expecting him to say, yeah, I did

89

1    it.

2        Q.    Sometimes, it works.

3        A.    But, if he knows that we know, then, maybe, he

4    wouldn't do it no more.

5        Q.    All right.  On the -- on -- on the evening of Friday

6    October 19, you said he was an alleged suspect.  And you were

7    one of the officers that responded to the scene.

8        A.    Yes, sir.

9        Q.    And do you know if a weapon was found on him that

10    night?

11        A.    He wasn't searched.

12        Q.    Okay.  So, there was no search whatsoever?

13        A.    No, sir.

14        Q.    So, you have no idea whether he was armed --

15        A.    No.

16        Q.    -- or not armed that evening?  I assume that he did

17    not display any weapon in your presence that evening.

18        A.    No, sir.

19        Q.    Did you have any communications with him on that

20    evening --

21        A.    No, sir.

22        Q.    -- Friday October 19?

23        A.    I dealt with the other guy with the marijuana.

24        Q.    Okay.  Did you take him into custody?

25        A.    No, wrote him a ticket.

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

Carolina Court Reporters, Inc.
Greenville, North Carolina
Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 23 of 82

1  Pritchard was apparently involved with before the shooting

2  occurred in this case?

3      A.   Okay.  Him and Booger, Daquan Spencer, call him

4  Booger, they got in a shootout.  Cedric was supposed to have a

5  revolver and Booger was supposed to have a 22 rifle.  22 rifle

6  was recovered and .38 special bullets that typically would go

7  in a revolver were recovered.

8      Q.   And how did you learn that information before the

9  shooting?

10     A.   Folk told me 'cause him and Jessie were still

11  working that night.

12     Q.   So, Officer Folk and --

13     A.   Detective Dickinson --

14     Q.   -- Detective Dickinson --

15     A.   Yes, sir.

16     Q.   -- were still working after you left at midnight?

17     A.   Yes, sir.

18     Q.   And did you talk with Officer Folk the following

19  day?

20     A.   Yes, sir.

21     Q.   Once you got on your shift?

22     A.   Yes, sir.

23     Q.   Okay.  And was this while you both were at the

24  temporary Police Office?

25     A.   Yes.

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858
Carolina Court Reporters, Inc.
Greenville, North Carolina

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 24 of 82

1    Q.   And is that what he relayed to you?

2    A.   Yes, sir.  He was packaging the gun and the bullets

3 at Station Two.

4    Q.   Did you see the report that Officer Folk was

5 completing?

6    A.   No.

7    Q.   Did you receive any more information about Mr.

8 Pritchard at that time?

9    A.   No, sir.

10    Q.   When you came to work on Saturday -- Sunday, October

11 21, was there any type of roll call that took place?

12    A.   No.  I'm on split shift, so, typically, I don't -

13 sometimes, I don't see anybody for a while.  He just happened

14 to be at the PD doing his evidence --

15    Q.   Okay.

16    A.   -- was why Folk was at Station Two or I call it PD,

17 Station Two, when I got to work.  'Cause I had a lot of stuff

18 I had to do, too.

19    Q.   Okay.  All right.  Is there anything else that you

20 knew about Cedric Pritchard before the shooting took place?

21    A.   No.

22    Q.   Had you ever personally dealt with him before the

23 shooting when he had been armed?

24    A.   I never dealt with him, period.

25    Q.   Okay.  Do you know whether there were any

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1 outstanding warrants for his arrest before the shooting on

2 October 21?

3  A.  I had not been told that we were looking for him.

4 Usually, if we're looking for somebody, they got warrants.

5 There was nothing mentioned of him being wanted or anything

6 like that, we weren't actively looking for him for any reason.

7  Q.  Okay.  And did you have any knowledge of his

8 criminal history before the shooting?

9  A.  No, sir.  I knew he was a convicted felon, but I

10 couldn't have told you for what.

11  Q.  Okay.  So, you would have known in general that he

12 was a convicted felon --

13  A.  Yes.

14  Q.  -- before the shooting took place?  And how would

15 you have learned that information?

16  A.  'Cause they were talking about him being in the

17 shootout,  Folk was like, he's a convicted felon, and I think

18 they searched him that Saturday night, and he didn't have

19 anything on him.

20  Q.  Okay.  And you said you think they searched him, is

21 this during --

22  A.  After the shootout.

23  Q.  Okay.

24  A.  They found him after the shootout, walking, and I

25 think they searched him, and I think that's where they found

1   the bullets for the revolver, but they did not find a gun, I

2   believe.

3                    MR. FRANZ HOLSCHER:  Do you mind if we take a

4   time out.

5                    MR. MAHONEY:  Well, actually, one more question

6   quickly.

7        Q.   Did you learn that information from Officer Folk?

8        A.   Yes.

9        Q.   And that would have been before the shooting took

10  place?

11       A.   Yes, sir.

12       Q.   Okay.

13                   MR. HOLSCHER:  And I'm not saying we've got to

14  stop.

15                   VIDEOGRAPHER:  Okay.  Going off the record.  The

16  time is 12:11 P.M.

17                   COURT REPORTER'S NOTE:  An off-the-record break was

18  taken from 12:11 P.M. until 1:31 P.M.

19                   ON CONTINUED EXAMINATION CONDUCTED BY MR. CARLOS E.

20  MAHONEY:

21       Q.   All right, we were talking before the lunch break

22  about what you knew about Cedric Pritchard.

23       A.   Yes, sir.

24       Q.   Did you see him at all on the evening of Saturday,

25  October 20?

1      Q.   Was he actually present during the investigation of

2   the shooting?

3      A.   I don't know.  I don't know why he was doing that,

4   'cause it was -- it happened during the night, and it -- it

5   may have happened close to shift change, that's what I -- I

6   know he was packaging -- he was dealing with the 22 and the

7   bullets.

8      Q.   I was curious about it because you had mentioned

9   that he worked typically 6:00 to 6:00 P.M. and that incident

10   occurred sometime after midnight.

11      A.   Yeah, and I don't know what time the shooting

12   actually occurred.  Sometimes, if something bleeds over to the

13   next shift, that shift will come in and handle it, so that the

14   other shift can go home.

15      Q.   Do you know if Office Folk had any personal

16   knowledge about what had occurred with that shooting the night

17   before?

18      A.   I don't know.

19      Q.   Do you know which officers investigated it?

20      A.   I know Jessie was out, but I don't know who else was

21   there, Jessie Dickinson.

22      Q.   Detective Dickinson?

23      A.   Yes, sir.

24      Q.   All right.  What happened next during your shift?

25      A.   Dispatcher gets a call of a wreck with injury at --
                    Carolina Court Reporters, Inc.
                    Greenville, North Carolina 27858

1  in front of Pam's Diner, which is on John Small Avenue.

2        Q.   Is that what's referred to as a 10-50PI?

3        A.   10-50PI, yes, sir.

4        Q.   Do you remember about what time that was?

5        A.   Ten minutes -- five minutes before the shooting.  I

6  mean, it was the whole reason I left Station Two was the

7  wreck.

8        Q.   So, you had been working in the office for the first

9  two and a half hours or so --

10       A.   Yes, sir.

11       Q.   -- three hours?  Okay.  All right, so, where were

12  you going to when you left the -- left Station Two?

13       A.   I was going to assist Sergeant Spinner on the wreck.

14       Q.   Which route did you take?

15       A.   15th Street.

16       Q.   Is that heading away from downtown?

17       A.   It's -- you've got 5th Street and 15th Street and

18  the City is in the middle.

19       Q.   Okay.

20       A.   5th Street is two lane, so, it's hard to navigate.

21  15th Street is four lane, I went 15th and Folk went 5th.

22       Q.   Were you running lights and siren on the way?

23       A.   No, sir.

24       Q.   All right.  What happened while you were on your way

25  to the accident scene?

1     A.   I heard Sergeant Spinner check on scene, and he

2  advised that the vehicles were out of the roadway, which, at

3  that point, he didn't need anybody else, 'cause we were only

4  going for traffic control.

5     Q.   And you were driving your 2015 Ford Explorer?

6     A.   Yes, sir.

7     Q.   I'm gonna hand you Exhibit [19].  Exhibit [19] is

8  the City of Washington's Patrol Operations Policy.  Were you

9  familiar with this policy before the shooting occurred?

10     A.   Yes, sir.

11     Q.   What I'd like you to do is take a look at page 6.

12  At the bottom of page 6, where the numbering 11 appears

13     A.   Yes, sir.

14     Q.   -- it says patrol vehicle equipment.

15     A.   Yes, sir.

16     Q.   Did your Ford Explorer have all of the equipment

17  listed here?

18     A.   Yes, sir.

19     Q.   Did you have any other equipment in your vehicle?

20     A.   Not that I can think of.  Not outside of that.

21     Q.   I'll show you what I've marked as Exhibit [20].

22  Thank you.  Exhibit [20] is the City's in-car camera systems

23  policy.

24     A.   Yeah.

25     Q.   Are you familiar with this policy?

1    A.    No, sir.

2    Q.    Is there a reason why?

3    A.    I was never told to.

4    Q.    All right, let's talk about what happened once you

5    learned that you were not needed at the accident scene.

6    A.    Okay.

7    Q.    What happened next?

8    A.    I was in front of the mall when I heard what

9    Sergeant Spinner said.  At that point, I know I'm not needed,

10   I'm coming up on Washington Street and 15th and I see a blue

11   Aztec pulling up to the stop sign at 15th and Pierce.

12   Q.    Were you familiar with this blue Aztec?

13   A.    I -- I was familiar with a blue Aztec that stayed in

14   that housing complex.

15   Q.    Which housing complex?

16   A.    Alderbrook.

17   Q.    What type of complex is Alderbrook?

18   A.    Section 8.  It's nice, but it's income based.

19   Q.    What's the racial demographics of Alderbrook?

20   A.    Probably, 80 percent black, 20 white.  And the

21   people that owned the Aztec were white.

22   Q.    When had you last dealt with the people who owned

23   the Aztec?

24   A.    Saturday night.

25   Q.    And what happened?

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 31 of 82

1    A.    Stopped a -- stopped it for a head light, and I knew

2    that the girl driving it had a criminal summons and 'cause the

3    registered owner didn't have a license, Dillon Bullock.  So,

4    Jessica Hurst was driving, stopped her for the head light and

5    the -- let her know about her summons.  And, then, when we got

6    up there to the window, backseat passenger had a warrant and

7    we got a felony drug case of Kiale Bandy in the backseat, as

8    well.

9    Q.    Who owned the vehicle?

10   A.    Dillon Bullock.

11   Q.    Did he have a reputation for being involved with

12   drugs?

13   A.    No.  I first learned about him from stealing from

14   Walmart.

15   Q.    Okay.

16   A.    Loss prevention said that they'd been having an

17   issue with a blue Aztec, white male, white female and she was

18   pregnant and that she's pregnant and -- yeah.

19   Q.    What was the summons that was outstanding for

20   Jessica --

21   A.    I ain't --

22   Q.    -- Hurst?

23   A.    I ain't got a clue.

24   Q.    Did she have a reputation for drug activity?

25   A.    Not that I know of.

1   Q.   All right.  Once you saw the blue Aztec, what did

2   you do?

3   A.   On the day of the shooting?

4   Q.   Yes, sir.

5   A.   It -- it got my attention because I knew it was

6   Jessica and Dillon's car, and I had just dealt with it the

7   night before, and it's the only vehicle that looks like a blue

8   Aztec.  It's -- it's a one of a kind shaped vehicle.  So, I'm

9   passing Washington, it's coming towards me, it turns off,

10  comes towards my direction.  I'm looking at it because it drew

11  my attention because it's their car coming out of where they

12  stay at.  And, as it's approaching me, I'm looking make sure

13  Dillon's not driving or if it's still Jessica, which I assumed

14  it was gonna be one of them and it's a black male, green hood

15  up over his head, and it -- I saw it was definitely Cedric.

16  Q.   Why did that spark your interest?

17  A.   It sparked my interest 'cause it's -- I was familiar

18  with the vehicle and he'd been wearing the same green hoodie

19  every day and he still had it on and, now, he's got it up over

20  his head, and I knew he didn't have a license.

21  Q.   So, was that the major issue -- that you believed

22  that he did not have a license?

23  A.   Yes.

24  Q.   Okay.  What time of day was this?

25  A.   Minute before the shooting.

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 33 of 82

1    Q.   So, around 3:45?

2    A.   Sure.  If -- whatever time the shooting was, take a

3  minute off of it.

4    Q.   Okay.  What was the weather like outside?

5    A.   It was clear.

6    Q.   Sunny?

7    A.   Yes.

8    Q.   Do you remember what the temperature was outside?

9    A.   I have no clue.

10    Q.   All right.  So, did you try to catch up to the

11  vehicle?

12    A.   No.  He had his left turn signal on, and he got

13  caught by the light.  So, I turned right on Pierce Street,

14  right on 13th, it's gonna bring me right out to where he's got

15  to come by if he's gonna take that left, it's a T

16  intersection.  And I sit at the stop sign and wait for him.

17    Q.   Let me do this.  I'm gonna give you these Google

18  maps here.  That looks a lot clearer than the copy I'm giving

19  to you, Clay, that officer Mobley has.  But I've marked that

20  as Exhibit [22].  Can you take this purple Sharpie and trace

21  the direction that you took?

22    A.   Yeah.  Make sure I don't go too far on 13th.  All

23  right.

24    Q.   Okay.  And where you stopped at --

25    A.   Stop sign.

1    Q.   Okay.  The stop sign at the corner --

2    A.   He's still here.

3    Q.   You say here.  Which road is that?

4    A.   He's at the light.  He's at 15th and Washington

5    facing west, turn signal to go south.

6    Q.   Okay.

7              MR. COLLIER:  Okay.  So, you've drawn a purple

8    line to 15th and Washington?

9    A.   15th and Pierce, Pierce to 13th, 13th back to

10   Washington, and that's where I stopped and waited for him to

11   come from this direction.

12             MR. COLLIER:  Okay.

13   A.   South.

14             MR. COLLIER:  All right.  Okay.  Can we put

15   like an arrow on there to show the direction that we're

16   talking about?

17             MR. MAHONEY:  Sure.

18             MR. COLLIER:  So we don't -- nobody --

19   Q.   And, sir, you've just drawn arrows to show your

20   direction --

21   A.   Yes.

22   Q.   -- that led you to the stop sign at 13th and

23   Washington.

24   A.   That's correct.

25   Q.   Okay.  All right.  And did you call communications

1   to report what you were doing?

2       A.   I called and asked for a request for his name and

3   for his driver's license.

4       Q.   So, you're requesting a driver's license check on

5   him?

6       A.   Yes, sir.

7       Q.   Is that -- is that what's referred to as a check 27?

8       A.   Yeah, 27 check for Cedric Pritchard.

9       Q.   And the dispatcher that you called, who was that?

10      A.   Jadey Fuller.

11      Q.   Is he the only one on duty that day?

12      A.   Yes, sir.

13      Q.   All right.  So, you call in to Mr. Fuller, and

14  you're waiting at the stop sign.  What happened next?

15      A.   Cedric turned south, comes by me, I see him plain as

16  day, again.

17      Q.   And does he pass by you?

18      A.   He did.

19      Q.   How fast was he traveling?

20           VIDEOGRAPHER:  Pull my mic out.

21           MR. MAHONEY:  Oh, I'm sorry.

22           VIDEOGRAPHER:  Just pull it towards --

23      A.   This way?

24           VIDEOGRAPHER:  Yeah.  Okay.

25      A.   Okay.  He had just come off from 15th Street, so he

1  was running 35 or less.

2      Q.   What is the speed limit on Washington in that area?

3      A.   I think it's 35.

4      Q.   So, he passes by you, and you see that he's driving.

5      A.   Yes.

6      Q.   What did you do?

7      A.   I pulled out behind him.

8      Q.   What speed did you accelerate to?

9      A.   Less than 35, 'cause I don't think we ever got up to

10  35.

11      Q.   All right.

12      A.   We could have, but I don't think we did.

13      Q.   So, once you pull onto Washington behind him, what

14  happened?

15      A.   I'm waiting for dispatch to give me anything back,

16  and he makes an unplanned stop on the left-side curb.  So, he

17  whips it to the left and comes to a halt in front of 1105

18  Washington Street.

19      Q.   When he whipped the car to the left, did you turn on

20  your lights?

21      A.   I believe I did, as soon as I saw him go left of

22  center to go park, I think that's when I activated my lights.

23      Q.   How long were you behind him before he whipped to

24  the left?

25      A.   Probably, five seconds.

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

Carolina Court Reporters, Inc.
Greenville, North Carolina
Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 37 of 82

1     Q.  Did you turn on your siren, as well?

2     A.  No, sir.

3     Q.  Is your car one of those cars where you have to hit

4  separate switches for each one?

5     A.  Yes, siren box is different from the -- well, it's

6  all connected, but you have to -- you've got a switch for

7  lights and switch for siren.

8     Q.  All right.  So, you suspect that he does not have a

9  license, but you had not heard back from communications --

10    A.  That's correct.

11    Q.  -- for verification at that point?

12    A.  That's correct.

13    Q.  Okay.  All right.  But, once he pulled to the left,

14  at that point, did you believe you had reasonable suspicion to

15  conduct a traffic stop?

16    A.  Yes, he broke two laws at that point.

17    Q.  And which laws had he broken?

18    A.  Left of center and parking left-side curb, which is

19  a city ordinance violation, and all city ordinance violations

20  are misdemeanors.

21    Q.  Class three?

22    A.  I guess, yeah.  I think it's 25 and cost of court; I

23  think that's what they charge.

24    Q.  Okay.  So, you then came up behind him.  Did he stop

25  his vehicle?

1     A.    Yeah, he stopped first.

2     Q.    And did you stop behind him?

3     A.    Yes, sir.

4     Q.    How far was your vehicle from his?

5     A.    Maybe a car length.

6     Q.    So, you mentioned an Aztec is -- is fairly unique

7 looking.

8     A.    Yes, sir.

9     Q.    Was it smaller than your car?

10    A.    Probably, about the same.  It was an SUV hatchback.

11    Q.    Okay.  How long is your vehicle?

12    A.    I've got no clue.

13    Q.    I think I looked it up and it was around 16 and a

14 half feet long; does that sound about right?

15    A.    Sounds about right, yeah.

16    Q.    And I looked up the Aztec, and it seemed to be a

17 little over 15 feet; is that more or less --

18    A.    Same size, yeah.

19    Q.    All right.  So, you're a car length behind.  What

20 did you do at that point?

21    A.    Because of the way he stopped, and it was not

22 planned, and that's not where I was planning on stopping him,

23 I gave her the tag number one -- I called a 10-61, which is a

24 traffic stop to us, gave her the tag number one time, which is

25 not normal, gave her the location, I might have got the

1  location wrong, and by this point, I'm already on the ground,

2  and I throw the mic in the car, which is all not typical of

3  how I would normally do it.

4      Q.  Okay.  And tell me why?

5      A.  Because of the way he stopped, unplanned.

6  Typically, when somebody does that, that's not normal, they're

7  trying to get away.  Either want us to go by or it sets them

8  up to get out the car.

9      Q.  And when you're saying, she, you're referring to

10 Jessie Fuller?

11     A.  The -- like dispatcher give it back --

12     Q.  Yes.

13     A.  Yeah.  Jadey Fuller.

14     Q.  Jadey Fuller.

15     A.  J-A-D-E-Y.  I'm waiting for her to give it back, but

16 I -- I went ahead and called a 10-61 as soon as he did what he

17 did, and I'm trying to get out of the car as fast as possible

18 just 'cause -- that's not -- I don't -- my typical is I go

19 ahead and do all my talking and, then, I've already put the

20 microphone up and, then, I turn the blue lights on.  I don't

21 want to deal with nothing but the violator and the car.

22     Q.  Did you have a sense that he was trying to stop

23 quickly, so he -- that he could flee from you?

24     A.  I knew he was stopping 'cause he knew that I was

25 behind him for a reason, because he -- he knew I knew that he

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

Carolina Court Reporters, Inc.
Greenville, North Carolina
Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 40 of 82

1    didn't have a license.

2        Q.    And did you have a sense as you're stopping behind

3    him that this could be a -- a runner?

4        A.    Once I locked eyes with him, yeah, I knew it was

5    different.

6        Q.    Okay.  How about before that, though?

7        A.    The way -- the way he stopped real fast, typically,

8    it could turn into something like that.

9        Q.    Okay.  You said 10-61, tell us what that is?

10       A.    That's a traffic stop.

11       Q.    And you called in the license plate?

12       A.    Yes, sir.  One time.

13       Q.    Did you hear back from --

14       A.    No.

15       Q.    -- Fuller before you got out of the car?

16       A.    Didn't hear anything.

17       Q.    All right.  I'm gonna use this photograph, which I'm

18   gonna mark as Exhibit [23].  Take a look at it.  The traffic

19   stop occurred at 1105 Washington Street; is that right?

20       A.    That's correct.

21       Q.    And does this photograph fairly and accurately

22   depict 1105 --

23       A.    Yeah.

24       Q.    -- Washington Street?

25       A.    1105 -- if this is 1105, it'd be the one on the

1    right.

2          Q.    Okay.  It's a duplex; correct?

3          A.    Yes.

4          Q.    And, so, the one on the left is 1103; is that right?

5          A.    It'd be 1107.

6          Q.    1107, okay.  And that's 1105.  And, then, the

7    building to the right of that, if you're looking at it, is

8    1103?

9          A.    1103, 1101.

10         Q.    Okay.

11         A.    And then -- and then the corner.

12         Q.    All right.  With relationship to the post -- postal

13   box at the bottom on the left-hand side of the -- of the

14   picture, where did you park your patrol car?

15         A.    We were both between the two mailboxes.

16         Q.    Okay.

17         A.    Somewhere between that -- the driveway at 1105 and

18   the -- his car was towards the driveway, mine would be kind of

19   in the center of the picture.

20         Q.    In the center of the picture?

21         A.    Yeah.  We would be filling this up.

22         Q.    And there was about one car length between the two

23   of you; is that right?

24         A.    Roundabouts.

25         Q.    So, in terms of the positioning of his vehicle,

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 42 of 82

1  where would that have been in relationship to the front door

2  at 1105?

3      A.  He was -- he was past the front door.

4      Q.  Past the front door?

5      A.  Yes, sir.

6      Q.  And how close to the mailbox for 1105 was he?

7      A.  I can't --

8      Q.  The one --

9      A.  I can't remember if he was before or after it, but

10  he was right at the mailbox.

11      Q.  Okay.  And when I'm referring to the mailbox, we're

12  talking about the one on the right-hand side --

13      A.  1105 mailbox; yes, sir.

14      Q.  -- of the photograph.

15      A.  Okay.

16      Q.  Okay.  So, did you get out of the car before he did?

17      A.  Yes, sir.

18      Q.  And what did you do when you got out of the car?

19      A.  Shut my door.  I'm looking at his side mirror, and

20  he's looking at me like a predator in the side mirror.

21      Q.  How long were you looking at him for?

22      A.  Maybe, a second.  Soon as I started going that way,

23  he's staring at me through the mirror, he's leaned down

24  looking at the mirror, I'm looking at him, I know it's him, he

25  knows it's me, and that's when the door flies open.

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

Carolina Court Reporters, Inc.
Greenville, North Carolina
Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 43 of 82

1       Q.   You mentioned that you had thrown your body mic into

2  the car.

3       A.   Threw my radio mic.

4       Q.   Your radio mic.

5       A.   Radio mic.

6       Q.   Okay.

7       A.   'Cause I'm trying to give it to her, the --

8  everything I need and I'm already out of the car, I'm

9  stretching the mic, 'cause I'm not sitting in this car the way

10 he pulls over and, then, I chunk it, didn't put it up, I just

11 let it go, I don't know where it went, shut the door, and,

12 then, I'm dealing with him.

13      Q.   Where was your body mic; was that still on your

14 belt?

15      A.   For the body cam or the --

16      Q.   In-car.

17      A.   Everything is on me.

18      Q.   Um-huh.

19      A.   Yeah.

20      Q.   Okay.

21      A.   Yeah.

22      Q.   So, you didn't leave that behind?

23      A.   No.

24      Q.   All right.  So, you get out, you toss down the radio

25 mic and --

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858
Carolina Court Reporters, Inc.
Greenville, North Carolina

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 44 of 82

1          MR. COLLIER:  He tossed down the radio mic and

2     then gets out.

3          A.   I'm standing on the ground when I let the mic go to

4     shoot back in the car.

5          MR. COLLIER:  Okay.

6          A.   I stretched it.

7          MR. COLLIER:  My bad.

8          Q.   So, it stretches back, and you're looking at him,

9     you see him looking at you like a predator.  What do you do

10    with your hands at that point?

11         A.   I'm just walking towards the car, at that point.

12         Q.   Okay.

13         A.   And the -- and the way I typically do it is, that's

14    when I'm turning my body cam on, as I'm approaching a car, I'm

15    turning my body cam on, I touch the back of the car, make

16    contact.  And, before I could get to the end of my car, he's

17    already threw the door open, at that point, the camera -- I'm

18    not worried about the body camera at that point.  That two to

19    three seconds it takes to come on and start recording, I ain't

20    worried about that at that point.

21         Q.   All right.  So, he's looking at you like a predator.

22    When you -- when you say that, tell me exactly what you mean

23    with the use of the word predator.

24         A.   Pure evil.

25         Q.   And you can see that from a second?

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 45 of 82

1   A.   Yes, sir.

2   Q.   Okay.  And, then, the door flies open?

3   A.   Yes, sir.

4   Q.   And what did you do once you saw the door fly open?

5   A.   I started to go at him for a foot chase, and that

6   was -- that was what I would typically believe is happening

7   until he produced a gun and, then, it changed everything.

8   Q.   Before he produced a gun, did you believe Mr.

9   Pritchard was armed or dangerous?

10   A.   I didn't think he was armed until I saw the gun in

11   his hand.

12   Q.   Had you called for back up --

13   A.   No, sir.

14   Q.   -- before you got out of the car?

15   A.   No, sir.  I didn't have time.

16   Q.   Are you familiar with what is called a known risk

17   traffic stop?

18   A.   Yes, sir.

19   Q.   Is that something that you --

20   A.   Yes.

21   Q.   -- refer to as a hot traffic stop?

22   A.   Yes.

23   Q.   Did you consider this to have been a known risk

24   traffic stop when you were first completing the traffic stop?

25   A.   No, sir.

1    Q.  All right, the door opens.  What happens next?

2    A.  He spins toward me, gun in hand, and I immediately

3  recognize it as a -- as a dark black gun, revolver or a

4  handgun or semi-automatic, dark, small, black.  I may have

5  called his name, I may not, in-between the door flying open

6  and me starting to go towards him, 'cause, sometimes, if you

7  call somebody by name, it stops them from doing whatever,

8  because they know they're -- you know who they are.  And

9  what's the point of running if they know it's me.  I mean,

10  it's just another charge.  So, as soon as I see the gun, I

11  break down my -- from foot chase mode to drawing my gun and

12  using good footwork with gun in hand.

13    Q.  All right.  Before you saw the gun, you had not

14  drawn your weapon?

15    A.  No.

16    Q.  Okay.  All right.  So you see that.  Tell me where

17  -- where the gun was?

18    A.  I believe it's in his right hand, and he gets out

19  the car, and he doesn't keep his back to me getting out of the

20  car.  He like faces me when he comes out and, then, he starts

21  moving to his right.  If he's facing me, he moves to his

22  right.

23    Q.  Like he's heading towards the building?

24    A.  He's heading towards that window of 105 -- 1105,

25  from there to there.  And I'm coming this way.

1  Q.  All right.  So your recollection is that he's going

2  in almost a direct line from his vehicle to the window at

3  1105.

4  A.  Yes.  I'd say from the mailbox to that window, that

5  angle and I'm coming towards the mailbox.

6  Q.  Okay.  He's not moving at an angle towards the

7  opening between the --

8  A.  No.

9  Q.  -- two buildings?

10  A.  He -- we don't know why he didn't run through the

11  grass.  He ran towards a brick wall.

12  Q.  All right.  So, when you saw the gun, how was it --

13  how was the gun positioned?

14  A.  When he come out, I saw the gun and him turn towards

15  me, he's got it in a firing position, turns towards me and,

16  then, he goes to his right towards that window.  Not to the

17  door, not to the grass, to the window.

18  Q.  What hand was he holding the gun in?

19  A.  I believe the right.

20  Q.  All right.  Did he point the gun at you?

21  A.  I saw the barrel at me.

22  Q.  When you say the barrel, what do you --

23  A.  It's the end of the gun that the bullet comes out

24  of.

25  Q.  Okay.  So, you felt, at that point, that he had the
              Carolina Court Reporters, Inc.
           Greenville, North Carolina 27858

1   gun in position where if he fired, he could have hit you?

2       A.   Yes.  He's in a firing position.  He's not

3   necessarily got to stretch it out, he's in a firing position,

4   hands where he can fire it, and he's got the tactical

5   advantage over me at that point.

6       Q.   And you do not have a weapon drawn at that juncture?

7       A.   No, sir.

8       Q.   All right.  So, he then takes steps to run away.

9       A.   Yes, sir.

10      Q.   Is that right?

11      A.   Yes.

12      Q.   All right.  Tell me what happened.

13      A.   He didn't run like a foot chase, like I've been in

14  plenty of foot chases.  When somebody is trying to get away,

15  they're giving it all they got.  He's not running very fast,

16  like he's trying to decide what he wants to do.  And, as he's

17  going away, the whole time he's running the -- the barrel

18  points at me.  I see -- I can see ribcage, armpit and, at that

19  point, I fire two shots, and he goes down.

20      Q.   Now, did you see him point the gun at you from

21  behind as he's running away?

22      A.   I see the barrel, that's the -- at least the second

23  time I've seen the barrel.

24      Q.   So, you saw it a second time --

25      A.   Yes, sir.

1    Q.   -- as he was running away.  You say -- you said that

2    you saw ribcage and --

3    A.   Ribcage and armpit, like --

4    Q.   -- and armpit.

5    A.   Like this way.  So, I see ribcage, armpit, and I

6    fire two -- and gun behind him and two shots, and he goes

7    down.

8    Q.   All right.  Can you stand up for us and show us

9    exactly what you're referring to?

10    A.   As he's running, he's running --

11    Q.   Uh-huh.

12    A.   -- gun swinging like you would run and seeing -- I'm

13    seeing this.

14    Q.   You're -- you're describing that --

15    A.   So, he can shoot, every time his -- his arm goes, he

16    can pull the trigger any time he wants.

17    Q.   Did you see him rotate his torso?

18    A.   It's not a rotation.  It's a running and swinging

19    and, at any time, he can shoot.  He could have shot all his --

20    all -- he could have fired every round during that time.

21    Q.   Okay.  Did you see him turn his head around while he

22    was running?

23    A.   I don't recall that.

24    Q.   All right.

25    A.   No, sir.

1     Q.   And, so, when you're referring to ribcage and

2   armpit --

3     A.   Yes.

4     Q.   -- you're referring to the normal sort of running

5   motion?

6     A.   Yes.

7     Q.   You're not saying that he rotated around --

8     A.   I didn't see --

9     Q.   -- as if he was shooting at you?

10     A.   I don't remember his hips going in one direction and

11   his shoulders being in another.  I just remember, as he's

12   running, the gun swinging, and he can shoot at any time he

13   wants.

14     Q.   Okay.  And, let me just make sure this is clear for

15   our record.

16     A.   Okay.

17     Q.   You're not saying that, as he's running, he rotated

18   his hips around where his shoulder would have been facing --

19     A.   No.

20     Q.   -- towards you?

21     A.   No.

22     Q.   Okay.  It would be more the natural movement of the

23   arms, as you're running, and he's got a gun in one hand?

24     A.   And as -- as he's running, the barrel is pointing at

25   me; he's not like he's stopped and turned around.  It's as

1  he's running, and I see his rib -- right ribcage, right armpit

2  and the gun pointed back, barrel pointed right at me, he can

3  squeeze off as many rounds as he wants.

4      Q.   And how many times did you see that?

5      A.   Twice.  Running?

6      Q.   Yes, sir.

7      A.   Once.

8      Q.   Okay.  So, you saw -- you saw the barrel once when

9  he got first out of the car and you saw it once as he's

10 running with his arms moving back and forth.

11     A.   Yes, sir.  'Cause I'm moving forward, and he's

12 moving forward, 'cause my momentum kept -- took me towards the

13 mailbox.

14     Q.   Did he fire at you?

15     A.   I don't know.

16     Q.   Do you know if any bullets were discovered at the

17 scene?

18     A.   I don't know.  I didn't hear my gun go off.

19     Q.   Okay.  Well, why -- why is that?

20     A.   Auditory -- auditory exclusion, yeah.

21     Q.   Tell us what that means?

22     A.   Means, sometimes, in a stressful situation, you

23 don't hear things like, for example, a gun going off in your

24 face, and you don't hear it.

25     Q.   Let's do it this way, then.  Do you have a

1    recollection right now of hearing his gun go off?

2         A.   No, sir.

3         Q.   How far was he from you when you first shot?

4         A.   Maybe 10 yards, 15.

5         Q.   And when you saw the gun a second time, when he was

6    running, how far would he have been from you then?

7         A.   I mean 10, 15 at the shots.  At the time of the

8    shots, probably, 10 yards.

9         Q.   Okay.  So, it was all fairly contemporaneous?

10        A.   Yes, sir.  That -- just a small yard.

11        Q.   You said earlier that all this took about two

12   seconds.

13        A.   Two seconds, yes, sir.

14        Q.   Did you tell him to stop?

15        A.   No, sir.

16        Q.   Did you yell anything in effect that you were going

17   to shoot?

18        A.   No, sir.

19        Q.   So, the only thing you said was, possibly, you

20   called out his name --

21        A.   Possibly.

22        Q.   -- when he got out of the car?

23        A.   Yes.

24        Q.   All right.  Did you shoot him with two hands on the

25   weapon?

1      A.    Yes, sir.

2      Q.    Pulled the trigger with your left finger?

3      A.    Yes, sir.

4      Q.    Where did the first bullet strike him?

5      A.    I have no clue.

6      Q.    What happened once he was hit with that first

7  bullet?

8      A.    I don't -- two shots and then he's on the ground.

9      Q.    Okay.

10      A.    I don't know if the first one or the second one or

11  both, but two shots, he's on the ground.

12      Q.    How much time passed between the two shots?

13      A.    It was all going -- time -- time kind of is funny in

14  a stressful situation like that.  It could have been a double

15  tap, which is super fast, it could have been a controlled

16  pair, which is fast, but just not super fast.  Could be bang,

17  bang or it could be bang, bang.

18      Q.    Okay.

19      A.    That's the difference.

20      Q.    You don't have a specific recollection --

21      A.    No, sir.

22      Q.    -- in your mind?

23      A.    No.

24      Q.    Did it feel like more of a controlled pair?

25      A.    It did.

1    Q.    And do you have a recollection in your mind of

2  feeling like time was slowing down at that point?

3    A.    Yes, sir.

4    Q.    Do you think you developed tunnel vision?

5    A.    No, sir.

6    Q.    It all happened too fast to do that?

7    A.    I was just on the front site once it was that time.

8    Q.    Where were you targeting to shoot him?

9    A.    Center mass.

10   Q.    Is it possible that you shot him first in the right

11 buttocks and then second --

12   A.    I have no clue --

13   Q.    -- in the left chest?

14   A.    -- where he was hit.

15   Q.    So, could it have been one way or the other?

16   A.    I have no clue.

17   Q.    You have no idea right now as to where he was stuck?

18   A.    No.

19   Q.    Have you ever seen the autopsy report?

20   A.    No, sir.

21   Q.    The autopsy report reflects that one bullet struck

22 him on the right buttock and lodged in the right iliac crest

23 of the pelvis.  Do you know where that is, generally?

24   A.    Sure.  Somewhere in the crease.

25   Q.    No.  Well, the iliac crest is, yes, but the right

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1    Q.   -- when he hit the ground?

2    A.   No, sir.

3    Q.   Once you saw him hit the ground, did you then

4    approach him?

5    A.   Yes, sir.

6    Q.   All right.  Tell us what you did.

7    A.   I rolled him onto his back, checked his pulse, it

8    was kind of weak, and then I started seeing if I was gonna

9    have to do CPR, and I was preparing for that.

10   Q.   Did you do CPR?

11   A.   No, sir.

12   Q.   Why not?

13   A.   'Cause when I checked his chest where I would do

14   compressions, he had a bulge in his -- like a softball sitting

15   in his chest between his pecs where you would want to do CPR.

16   Q.   What did you think that was?

17   A.   Probably a bone.

18   Q.   Was it a hard mass?

19   A.   Yeah.  Yes, sir.

20   Q.   How did you react to that?

21   A.   It shocked me, 'cause it's not normal.  All the

22   training you do is normal how you would expect to do CPR.

23   I've done CPR before and it won't like that.

24   Q.   So, he landed on his left side.  Do you recall how

25   his legs were positioned?

1      A.   One was over the top of the other, but hands were

2   out in front.  One leg was kind of straight, one leg was over

3   top of the other, and the gun was laying in front of his

4   hands.

5      Q.   And, then, you rolled him over onto his back.

6      A.   Back, yes, sir.

7      Q.   Before rolling over -- him over to his back, did you

8   move him at all?

9      A.   No, just that.

10     Q.   Did you say his name?

11     A.   I, probably, did, several times.

12     Q.   Did he respond at all?

13     A.   No, sir.

14     Q.   Was he completely unresponsive once he hit the

15  ground?

16     A.   Yes.

17     Q.   You mentioned that there was a slight pulse.  Did

18  you try to see if he was breathing?

19     A.   His eyes were open and he had -- he had a slight

20  pulse.  And, then, when I put him on his back, and he had that

21  mass in his chest, that was it.

22     Q.   So, was it your belief that he was still alive when

23  you first rolled him over?

24     A.   I believe he was.

25     Q.   At what point did you recognize that he was not --

1    not alive?

2        A.    When they covered him up.

3        Q.    And you're referring to the EMTs?

4        A.    EMS, yes, sir.

5        Q.    How long after the shooting was that?

6        A.    Maybe, 10 minutes, 15 minutes, time they could

7    arrive.

8        Q.    Did you make any calls before rolling him onto his

9    back?

10       A.    I called for EMS for him.  I didn't call for any

11   back up for me.

12       Q.    You felt that he had been neutralized?

13       A.    Yes.  I -- I told her to send EMS 10-18 which means

14   pretty dang quick.

15       Q.    How soon did others arrive at the scene?

16       A.    A couple minutes.

17       Q.    When did you realize that you needed to turn on your

18   body cam?

19       A.    Once I - I, probably, turned it on soon as after I

20   called in, and I saw Moby getting out of his truck, and it's

21   some point right in there is when I turned it on.

22       Q.    How much time passed between the shooting and when

23   you turned on the body camera?

24       A.    I can't -- I couldn't -- I couldn't begin to tell

25   you.  A minute or two, probably, somewhere -- I don't know.

1    Q.    How did this affect you?

2    A.    How did this whole thing affect me?

3    Q.    At the scene, that is.

4    A.    I was in shock.

5    Q.    And tell me what you mean by that.

6    A.    You don't know how -- I mean, until you do it, you

7    don't know how you're gonna act.  You have a way of thinking

8    of how something's gonna be, until you do it and -- it's

9    surreal, you can't believe you did it, that you had to do it,

10   that you were involved in something like that, and pretty much

11   know that your life has just changed forever.

12   Q.    Did you take a moment to try to gather yourself or

13   to, I don't know, have a deep breath before you went up to

14   check on him or --

15   A.    No.

16   Q.    -- did you go straight up to check on him?

17   A.    I was more concerned for him that whole time until

18   they forced me to leave him.  I didn't leave him until they

19   forced me to.

20   Q.    And you're saying them.  Are you referring to --

21   A.    Corporal Hassell.

22   Q.    -- your supervisor?

23   A.    I stayed with Cedric until he told me to go sit in

24   the car, 'cause I won't leaving Cedric until then.  And, then,

25   I told him that he needs to come over here and check on

145

1  Cedric, if I'm gonna leave Cedric and, then, I went and sat in

2  my car.

3        Q.   Were you hoping he was alive?

4        A.   Yes.

5        Q.   Did he say anything to you before the shooting

6  occurred?

7        A.   He did not.

8        Q.   Were you able to clearly see him when you shot

9  Pritchard?

10        A.   Yes, sir.

11        Q.   There were no obstructions in the area?

12        A.   No, sir, nothing in the way.

13        Q.   Did you see anyone in the area before the shooting

14  took place?

15        A.   No one.

16        Q.   All right.  You mentioned that you did not give him

17  a verbal warning that you were gonna shoot before you did.

18        A.   That's correct.

19        Q.   Could you have given a warning before shooting him?

20        A.   No, sir.

21        Q.   Why was it not feasible?

22        A.   There was no time in the situation.  When somebody

23  is pointing a gun at you, there's no time to talk.

24        Q.   All right.  Tell us why you shot Cedric Pritchard?

25        A.   'Cause he was pointing a gun at me.
                    Carolina Court Reporters, Inc.
                 Greenville, North Carolina 27858

1      Q.    Which time?  The first time, the second time?

2      A.    He pointed it both times.

3      Q.    Did you have the opportunity to shoot him in

4   connection with the first point?

5      A.    No.

6      Q.    So, it was on connection with the second point --

7      A.    Yes, sir.

8      Q.    -- as he's running away?

9      A.    Yes, sir.

10      Q.    How did Mr. Pritchard pose an imminent threat of

11   death or serious physical injury to you when you made the

12   decision to shoot him?

13      A.    'Cause he was pointing a deadly weapon at me.

14      Q.    As he was running?

15      A.    Yes, sir.

16      Q.    And you considered that to be an imminent threat

17   that he was gonna shoot at you?

18      A.    Yes, sir.

19      Q.    All right.  Any other times that he pointed the

20   barrel before the shooting took place?

21      A.    No, sir, not that I can recall.

22      Q.    Did you ever consider using a Taser during the

23   traffic stop?

24      A.    No, sir.

25      Q.    Did you ever consider taking cover and allowing him

1    to run away?

2        A.    No, sir.

3        Q.    Was that feasible?

4        A.    No, sir.

5        Q.    And tell me why not?

6        A.    'Cause I was in the wide open.

7        Q.    When you shot him, were you at an angle from him?

8        A.    I think by the time that happened, my momentum had

9    lined me up with him.

10       Q.    So, it would have been --

11       A.    'Cause he was kind of coming towards me, and I'm

12   kind of coming towards him, and we meet in the middle.

13       Q.    So, the actual shooting of him, you would have been

14   almost at a 90-degree angle from his location?

15       A.    He'd have been -- yeah, right in line with him.

16       Q.    And how far was he from the end of the building when

17   he was shot?

18       A.    Maybe, less than ten feet.  On, from the -- from the

19   -- he was in front of the window -- about ten feet from the

20   window.  So, from the window to the end of the building.  So,

21   probably, ten by ten.

22       Q.    About ten by ten.

23       A.    Yeah.

24       Q.    Where do you think he was running to?

25       A.    Brick wall.

1  nobody knew what was going on.  The dispatcher didn't know

2  what was going on.

3      Q.  How quickly after the shooting did you report shots

4  fired?

5      A.  Soon as I got up to Cedric.  Soon as a I saw that he

6  needed it, I called it quick.

7      Q.  And, then, you also called for EMS at that same

8  time?

9      A.  Yes.

10     Q.  Did you have any other requests at that point?

11     A.  No, sir.

12     Q.  And, then, you'd mentioned Corporal Hassell showed

13  up.

14     A.  Yes, sir.

15     Q.  Was he the next officer that you saw?

16     A.  It was Lisa, Corporal Hassell, Folk, and Spinner was

17  the last one to get there, 'cause he was still on the wreck.

18     Q.  And Corporal Hassell asked you to go back to your

19  car?

20     A.  Yep.

21     Q.  Did he ask you to write a statement?

22     A.  He sure did.

23     Q.  Did you write a statement?

24     A.  No, sir.

25     Q.  Why not?

1    A.   There was no way I could write a statement at that

2  point.

3    Q.   Because?

4    A.   The shock of what had just happened, nerves,

5  everything going on, there was a hostile crowd forming, there

6  just won't no way I could sit right there and write a

7  statement.

8    Q.   Okay.  Did you remain in your car at the scene until

9  you left?

10    A.   Yeah, I was at my car till somebody picked me up and

11  took me to Station Two.

12    Q.   I think I saw that maybe Cliff Hales picked --

13    A.   Yes.

14    Q.   -- you up.

15    A.   That's correct.

16    Q.   Is that another officer?

17    A.   He was a captain.

18    Q.   All right.  Did you talk to anybody else at the

19  scene about what happened?

20    A.   I called my wife, told her what happened, told her

21  to call my dad, and, at some point, I talked to Jessie and the

22  Chief.  That's all I can remember who I talked to.

23    Q.   Did Detective Dickinson call you?

24    A.   I called -- yeah, he called me.  Somebody had called

25  him.

1    Q.   How about the Chief; was that a phone call or did he

2    come up to the car?

3    A.   I think he called me.  He called me or I called

4    him or somebody -- I might have talked to Spinner, too, I

5    can't remember.  Spinner -- everybody coming and going and I

6    can't --

7    Q.   All right.  Did you get any advice about what to do

8    from your wife?

9    A.   No.

10   Q.   How about from your father?

11   A.   No.

12   Q.   Detective Dickinson?

13   A.   No.

14   Q.   Chief Drakeford?

15   A.   No.

16   Q.   What did you talk to the Chief about?

17   A.   He just asked me if I was okay, and I said, yes, and

18   he shut the door, and he went and did his thing.

19   Q.   Same thing with Detective Dickinson; what did you

20   talk with him about?

21   A.   He asked me what happened.  I told him I had got in

22   a shooting with Cedric, and he said, I'm on the way, and that

23   was it.

24   Q.   All right.  When Captain Hales picked you up, where

25   did you go?

1    that.

2        Q.   All right.  You've got here listed firearm by felon.

3        A.   Yes, sir.

4        Q.   Did you discover that he was a felon afterwards?

5        A.   I knew he was a felon.

6        Q.   You knew he was beforehand.

7        A.   Yeah.

8        Q.   Okay.  But you just didn't know --

9        A.   I didn't know why, I just knew he was from the

10   shooting.

11       Q.   All right.  Let's take ten, then, we'll finish up.

12            VIDEOGRAPHER:  Okay.  Going off the record.  The

13   time is 2:55 P.M.

14            COURT REPORTER'S NOTE:  An off-the-record break was

15   taken from 2:55 P.M. until 3:07 P.M.

16            ON CONTINUED EXAMINATION CONDUCTED BY MR. CARLOS E.

17   MAHONEY:

18       Q.   Officer Mobley, is it possible for you to recall how

19   many steps Mr. Pritchard took between each shot?

20       A.   I couldn't begin to tell you.  He was moving, I was

21   moving.

22       Q.   And you initially described him as sort of running

23   slower.  Is that how --

24       A.   Slower than a foot chase.  He wasn't running to get

25   away.

1      Q.   Okay.  And, tell me exactly what you mean by that.

2      A.   When somebody is trying to get away, they run at 150

3  miles an hour, I mean they're running full speed plus some.

4  He was like not.  He was slow.

5      Q.   At a jog?

6      A.   Yeah, I mean, he won't running to get away, he was

7  like running to buy some time to see what he was gonna do.

8      Q.   Okay.

9      A.   And there's a difference.

10      Q.   So, you would describe it as -- as a jog-type pace?

11      A.   Yeah, it wasn't a full -- yeah, he wasn't in a

12  sprint.

13      Q.   If you'd have wanted to, was he running slow enough

14  that you could have tackled him?

15      A.   Without the gun.

16      Q.   Yes, sir.  Yeah.

17      A.   If he didn't have a gun, yeah, I could have caught

18  him and tackled him.

19      Q.   Okay.  According to the SBI file, you were

20  interviewed by Special Agent JM Lewis on October 25, 2018.

21      A.   That's correct.

22      Q.   Where did the interview take place?

23      A.   At the SB -- at the SBI field office in Greenville.

24      Q.   Who was present?

25      A.   Agent Lewis, my attorney, Mike Fitzpatrick, and

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1  taken from 3:27 P.M. until 3:35 P.M.

2         ON CONTINUED EXAMINATION CONDUCTED BY MR. CARLOS E.

3  MAHONEY:

4     Q.   All right.  So, while we were off the record, did

5  you have a chance to review the video from your in-car camera?

6     A.   I did.

7     Q.   And we looked at it both on regular speed, as well

8  as at slowed down speed?

9     A.   Yes, sir.

10    Q.   From reviewing the video --

11         MR. COLLIER:  You're gonna -- you're gonna

12  identify it as an exhibit number; right?

13         MR. MAHONEY:  I think we already did, but I'll

14  do it in one second.

15         MR. COLLIER:  Okay.

16         MR. MAHONEY:  Yeah.

17         MR. COLLIER:  Okay.

18    Q.   Since Mr. Collier interrupted me --

19         MR. COLLIER:  Excuse me.

20    Q.   -- what we're looking at here is Exhibit [35] --

21    A.   [35].

22    Q.   -- which is the in-car camera video.

23    A.   Yes, sir.

24         MR. COLLIER:  And, for the record, Exhibit [35]

25  was the subject of a previous State court action that Mr.

1  Cecil and I and Mr. Holscher were involved in, and there's an

2  order existing, and what we're doing here, this is produced in

3  connection with this Federal case by the State Bureau of

4  Investigation under a stipulation that's been approved by the

5  Federal Judge, but we're also trying to -- we're gonna -- we

6  don't want to disrespect the State Court Judge, so the --

7  we're -- our intent is to use it consistent with all the

8  rulings that we have.  Good enough?

9             MR. MAHONEY:  Yes, sir.

10            MR. COLLIER:  Thank you.

11    Q.  Yes, sir.  So, just to orient ourselves, what we're

12  looking at has a time stamp at the top.

13    A.  Yes, sir.

14    Q.  And it's a got a date, as well; correct?

15    A.  Yes, sir.

16    Q.  And the date is October 21, 2018.

17    A.  That's correct.

18    Q.  The time is 14:48 hours and 21 seconds on this

19  screen currently; correct?

20    A.  That's correct.

21    Q.  And we know that the shooting actually occurred at

22  3:49 P.M.  So, this just has not synced with the then existing

23  time.

24    A.  Yes.

25    Q.  Is that accurate?

1    A.    Yeah.

2    Q.    It's essentially running --

3    A.    Yes.

4    Q.    -- an hour behind.

5    A.    Yes.

6    Q.    Okay.  All right, before I -- I play it, I'm gonna

7  play it at slow speed for you, because I've got some specific

8  questions, what reaction did you have to watching the video

9  before we came back on camera?

10    A.    It happened super fast.

11    Q.    And is that consistent with your recollection of

12  events?

13    A.    At the time, I couldn't have told you exactly how

14  fast because the stress effect and time either slowing down.

15  It happened faster than I thought.

16    Q.    Okay.  From looking at the video, was there anything

17  that you saw that seemed a little different from your memory?

18    A.    I didn't realize how close I was to him.

19    Q.    Okay.

20    A.    Initially.

21    Q.    Okay.  All right.  Okay.  So, the current view that

22  we're looking at is while you're parked at the stop sign

23  waiting for him to pass you --

24    A.    Yes, sir.

25    Q.    -- on Washington.

1      A.   Yes, sir.

2      Q.   Is that right?  Okay.  And I'm gonna press play.

3  All right, and we're playing this at half speed currently.

4      A.   Yes, sir.

5      Q.   Which makes it a little bit easier to see what's

6  going on; correct?

7      A.   Yes, sir.

8      Q.   All right.  So 15:48 and 29 seconds, the Aztec is

9  passing you by.

10      A.   Yes, sir.

11      Q.   Okay.  Now, we're at 15:48 and 32 seconds, and

12  you've now turned left onto Washington Street and the Aztec is

13  up ahead of you.

14      A.   That's correct.

15      Q.   All right.  I've now stopped it at 15:48 and 37

16  seconds, and he's starting to drive to the left.

17      A.   Yes, sir.

18      Q.   Is that accurate?

19      A.   Yes, sir.

20      Q.   And, by this point, you've now turned on your

21  lights.

22      A.   Yes, sir.

23      Q.   And you can actually see a little designation on the

24  left-hand corner of the video.

25      A.   Yes, sir.

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

Carolina Court Reporters, Inc.
Greenville, North Carolina

1    Q.   And, just for the record, I'm referring to 15:48 and

2    39 seconds.

3    A.   Yes, sir.

4    Q.   All right.  And his brakes lights have come on; is

5    that accurate?

6    A.   That's correct.

7    Q.   And, in terms of his location, as he's pulling in,

8    he's around the mailbox for what would be 1107 Washington

9    Street.

10   A.   Yes, sir.

11   Q.   All right.  Now, I've stopped it at 15:48 and 44

12   seconds, and it appears that he's just about at a complete

13   stop.

14   A.   Yes, sir.

15   Q.   And you've come to just about a complete stop; is

16   that right?

17   A.   That's correct.

18   Q.   And you, actually, see his car come backwards.

19   A.   That's correct.

20   Q.   All right.  Now, we're at 15:48 and 51 seconds, and

21   we've see his car door open.

22   A.   Yes.

23   Q.   And it appears that you're out of the car already;

24   is that right?

25   A.   That's correct.

1     Q.   How -- how long would you have been out -- out of

2  the car at that point?

3     A.   In time for me to shut my door and start walking.  I

4  didn't delay any --

5     Q.   Okay.

6     A.   -- any time.

7     Q.   So, once you got your car to a full stop, you were

8  out of it within two to three seconds?

9     A.   Yes.

10    Q.   All right.  All right.  15:48 and 52 seconds, he's

11  come out --

12    A.   Yes, sir.

13    Q.   -- of the car; correct?

14    A.   Yes, sir.

15    Q.   And, is this when he's looking at you?

16    A.   From my angle where I'm at, I can see better than

17  the car camera can see, so I've seen the gun before the camera

18  sees it, because I'm beside my car, and I can see him better

19  than the camera.  So, I've already seen the gun, you can

20  already see I'm starting to draw already.

21    Q.   On your left side.

22    A.   You see the gun in his hand, and I -- you can see

23  I'm already drawing, 'cause I've seen it prior to the camera

24  seeing it, 'cause I've already seen him face me with the gun,

25  and I've already started my way towards him and I'm drawing at

1   that point.

2        Q.   Okay.  So, we see the door open at 51 seconds and,

3   then, we see he's clearly out of the car at 52, so it's within

4   that little --

5        A.   Yes, sir.

6        Q.   -- time period?  And the gun -- can you tell us or

7   just show us which hand he's got it in?  You're pointing to

8   the right hand?

9        A.   You see the gun.  Yeah.

10       Q.   Okay.  And, he has looked at you for a moment?

11       A.   He looked at me getting out.  My -- as soon as the

12  door opens, he's facing me and, then, he starts taking off

13  that way.

14       Q.   Okay.  And is -- is that when the gun was first

15  pointed at you?

16       A.   Yes, when the -- when he first come out, my angle to

17  him, it's pointing more to me and not this -- this angle and

18  my angle are two different angles.

19       Q.   So, it looks like you're grabbing back --

20       A.   Left hand.  That's going -- that's drawing the gun.

21       Q.   -- with your left hand --

22       A.   Yes, sir.

23       Q.   -- to draw your gun.  What are you doing with your

24  right hand there?

25       A.   Not doing anything.

1     Q.   Okay.  It looks like, maybe, you're either coming up

2  towards your chest or you're coming like --

3     A.   My draw, I'm gonna -- I'm gonna meet my gun in the

4  middle with my draw.

5     Q.   Got you.  Okay.  All right.  52 seconds, still, he's

6  starting to move away from you?

7     A.   Um-huh.

8     Q.   And, at this point, you've got the gun completely

9  out; is that right?

10    A.   Yes, sir.

11    Q.   You've got two hands on it.

12    A.   Yes, sir.

13    Q.   And it looks like --

14    A.   I hadn't pushed out yet.  You can still see that arm

15  is bent, so I'm --

16    Q.   Okay.

17    A.   I'm just now getting to the center, and I'm about to

18  press out.

19    Q.   But, you're squaring up towards him; right?

20    A.   Yeah, I'm square.

21    Q.   Yeah.

22    A.   Now, it's just the press out.

23    Q.   Okay.  All right.  So, now, I've stopped it at 14:48

24  and 52, which is still within the same second.

25    A.   Yeah.

1  Q. And, you've now gotten it up, gotten the gun up.

2  A. Now, I'm pressed now.

3  Q. Okay.  All right.  So, at 14 -- 15:48:53, he's

4 moving away from you, and you've now pointed the gun at him;

5 is that right?

6  A. Now, he's pointing a gun at me, and I'm pointing a

7 gun at him.

8  Q. All right.  So, as he's moving away from you, you

9 can see his arm coming up and it's then that you say that he's

10 pointing the gun at you?

11  A. Yes, now the guns -- I'm moving that way, he's

12 moving -- he's moving this way, I'm moving that way, I'm

13 looking at the gun, I'm looking at him, now, he's now got it

14 -- he's got the tactical advantage -- he can pull the trigger

15 when he wants.  He knows what he's gonna do, I don't know what

16 he's gonna do, so, until my gun goes off, he doesn't -- he has

17 the advantage over me.

18  Q. Is he angled at you, at that point?

19  A. He's -- from the car angle, it looks like that.

20 From my angle, now, I'm almost -- I'm coming -- he's going

21 towards there, and I'm going behind him, and the gun is -- you

22 can see how his arm to his wrist is in a funky -- it's -- it's

23 kinked towards me.

24  Q. Okay.  So, that's the second time --

25  A. That's the second time.

1    Q.   -- that the barrel was pointed at you?

2    A.   And my gun is probably discharging about right then.

3    Q.   Okay.

4    A.   There.

5    Q.   And we see the shot just within a millisecond after

6    that.

7    A.   Yeah, yeah.

8    Q.   And that's the first shot; correct?

9    A.   That's the first shot.

10   Q.   All right.  Looking at the shot that was produced on

11   the video, does that help you at all with trying to figure out

12   where the first shot hit him?

13   A.   No.

14   Q.   Okay.

15   A.   I still couldn't tell.

16   Q.   All right.  And that's at 53 seconds.

17   A.   And that's the second shot.

18   Q.   And that's at 54 seconds.

19   A.   Yes, sir.

20   Q.   Okay.  Any -- it looks like maybe you took one step

21   between shots?

22   A.   Possible.

23   Q.   Did your hands change positioning at all --

24   A.   No.

25   Q.   -- that you could see?

1    A.   No.

2    Q.   Having seen the two shots back to back, does that

3  help at all with trying to figure out which shot hit where on

4  him?

5    A.   No.

6    Q.   Okay.

7    A.   You can't tell.  And --

8    Q.   Could you actually see smoke coming up from your

9  weapon?

10   A.   Yeah, both shots had --

11   Q.   All right.  So, at 55 seconds, you're now starting

12  to move towards him; is that right?

13   A.   That's correct.

14   Q.   All right.  Now, watching you walk to the end of the

15  video screen, were you walking at an angle towards the

16  driveway or were you going --

17   A.   No.

18   Q.   -- directly across?

19   A.   I'm going straight up there.  So, I was there, I

20  walked straight down that grass line.

21   Q.   Okay.

22   A.   He was right there at where the sidewalk goes left,

23  'cause they've got a driveway and then a walkway.

24   Q.   Okay.

25   A.   He's right there at the -- where it separates.

1    Q.   Were you -- were you coming up on him, taking a wide

2    approach, or were you coming directly up --

3    A.   No.

4    Q.   -- on him on a straight angle?

5    A.   I was going to him.  From there, I walked straight

6    up to him.

7    Q.   Okay.

8    A.   The gun is laying probably about where I'm at, he's

9    laying this way, and all his hands and feet are facing that

10   way.

11   Q.   Did you kick the gun away?

12   A.   No, no.  It was far enough away and he was in bad

13   enough shape that that won't -- he wasn't a threat no more.

14   Q.   All right.  I'm gonna put this on regular speed.  I

15   just had a couple of other things I wanted to go over.  I'm

16   just gonna pause it for one second.  From listening to -- or

17   watching this video, we can hear some static, but we can't

18   hear any noise; is that right?

19   A.   Um-uh.

20   Q.   When you watched the video, could you hear anything

21   on the video?

22   A.   No, sir.

23   Q.   Is that an indication that your body mic was not

24   synced with the video?

25   A.   That's correct.  You would have -- you would have

1      A.    Yes, sir.

2      Q.    From watching the videos, can you give us an idea as

3 to how long that may have lasted?

4      A.    From the time I got out of the car till the time you

5 see his door open, he never took his eyes off of me, and I

6 didn't take my eyes off of him.

7      Q.    Okay.

8      A.    So, a few seconds.

9      Q.    Okay.  And, while you were watching that, did you

10 have the car door open or was it shut, at that point?

11      A.    Mine was shut.

12      Q.    Yours was shut.

13      A.    Yeah.

14      Q.    So, you shut it, so, you're standing there --

15      A.    Now, I'm starting to go.

16      Q.    You're starting to walk --

17      A.    Yeah.

18      Q.    -- towards him --

19      A.    Yes.

20      Q.    -- and you're seeing him eyeing you in the mirror?

21      A.    Yes, sir.

22      Q.    Okay.

23      A.    So, I maybe took two steps 'cause the time, it picks

24 me up, I hadn't cleared the corner of my car yet.  So, two

25 steps, and I'm -- I'm in view.

1      Q.   Okay.  It looks like you were just hanging outside

2  the car for a minute or so.

3      A.   Yes.

4      Q.   Why were you doing that?

5      A.   I was too -- I just -- I didn't want to get in the

6  car.

7      Q.   Yeah.

8      A.   You feel helpless.

9      Q.   Did Corporal Hassell tell you to go back?

10     A.   He keeps telling me to go get in the car.

11     Q.   All right.  So, you're wanting to do something?

12     A.   Yeah.

13     Q.   You're, probably, revved up at that point.

14     A.   Yeah, oh, yeah.

15     Q.   All right.  And, so, then, at 15:57 and 28 seconds,

16  you've gotten in the car.

17     A.   Yes, sir.

18     Q.   All right.  Looking at the video and the car at

19  15:57 and 32 seconds, in the left-hand windshield, is that the

20  in-car camera there?

21     A.   No, sir.  That's radar.

22     Q.   That's radar, okay.  Where is the actual --

23     A.   To the right of the rear-view mirror.

24     Q.   Got it.  Okay.  All right, sir, that's all I got

25  with this.

                    Carolina Court Reporters, Inc.
                    Greenville, North Carolina 27858

Carolina Court Reporters, Inc.
Greenville, North Carolina

1           MR. COLLIER:  Officer Mobley, I appreciate your

2  time, and I don't have any further questions, at this time,

3  sir, or any questions, at this time, for that matter.

4           MR. MAHONEY:  We're done.

5     A.  We're done.

6          VIDEOGRAPHER:  All right, good.  So, this concludes

7  the deposition of Officer Aaron Mobley.

8     A.  Mobley.

9           VIDEOGRAPHER:  The time is 4:13 P.M.

10         THE DEPOSITION CONCLUDED AT 4:13 P.M.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 4:20-cv-00060-M   Document 31-3   Filed 05/28/21   Page 82 of 82