UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 4:20-CV-60-M

```
THERESA PRITCHARD as        )
Administrator of the Estate )
of Cedric D. Pritchard,     )
                            )          D-E-P-O-S-I-T-I-O-N
             PLAINTIFF,     )
                            )                 OF
     v.                     )
                            )
AARON M. MOBLEY, in his     )      MICHAEL SUTTON, MSME, PE
Individual Capacity, and    )
CITY OF WASHINGTON,         )
                            )
             DEFENDANTS.    )
```

 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

ON APRIL 6, 2021, AT ACCIDENT RESEARCH SPECIALIST, PLLC,
LOCATED AT 1631 NW MAYNARD ROAD, IN CARY, NORTH CAROLINA.


APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:  MR. CARLOS E. MAHONEY
                    GLENN, MILLS, FISHER, MAHONEY, P.A.
                    MEASUREMENT BUILDING
                    404 HUNT STREET, SUITE 100
                    DURHAM, NORTH CAROLINA 27701

                    MR. SEAN P. CECIL
                    EDELSTEIN & PAYNE
                    315 EAST JONES STREET
                    RALEIGH, NORTH CAROLINA 27611

FOR THE DEFENDANTS: MR. NORWOOD P. BLANCHARD, III
                    CROSSLEY MCINTOSH COLLIER
                       HANLEY & EDES, P.L.L.C.
                    5002 RANDALL PARKWAY
                    WILMINGTON, NORTH CAROLINA 28403


COURT REPORTER:     SHEILA B. DARDEN

---

**Carolina Court Reporters, Inc.**
105 Oakmont Drive, Suite A
Greenville, North Carolina 27858
252-355-4700  800-849-8448  FAX 252-355-4707

STIPULATIONS: PRIOR TO THE GIVING OF ANY TESTIMONY BY THE WITNESS, IT WAS EXPRESSLY STIPULATED AND AGREED BETWEEN THE PARTIES TO THIS ACTION, THROUGH THEIR RESPECTIVE COUNSEL, THAT:

1.    BY NOTICE AND/OR CONSENT, THE DEPOSITION OF MICHAEL SUTTON, MSME, PE, WAS TAKEN ON THE 6TH DAY OF APRIL 2021, BEGINNING AT 1:20 P.M., AT ACCIDENT RESEARCH SPECIALISTS, PLLC, LOCATED AT 1631 MAYNARD ROAD, CARY, NORTH CAROLINA, BEFORE SHEILA B. DARDEN, A COURT REPORTER AND NOTARY PUBLIC IN AND FOR THE COUNTY OF GREENE.

2.    SAID DEPOSITION SHALL BE TAKEN FOR THE PURPOSE OF DISCOVERY OR FOR USE AS EVIDENCE IN THE ABOVE-ENTITLED ACTION OR FOR BOTH PURPOSES.

3.    ANY OBJECTIONS OF ANY PARTY HERE AS TO NOTICE OF THE TAKING OF SAID DEPOSITION OR AS TO THE TIME OR PLACE THEREOF OR AS TO THE QUALIFICATIONS OF THE PERSON BEFORE WHOM THE SAME SHALL BE TAKEN ARE HEREBY WAIVED.

4.    RULES 26 AND 32 OF THE NORTH CAROLINA RULES OF CIVIL PROCEDURE SHALL CONTROL THE TAKING OF SAID DEPOSITION AND ITS USE THEREOF IN COURT.

5.    OBJECTIONS TO QUESTIONS AND MOTIONS TO STRIKE THE ANSWER NEED NOT BE MADE DURING THE TAKING OF THIS DEPOSITION, BUT MAY BE MADE FOR THE FIRST TIME DURING THE

PROGRESS OF THE TRIAL OF THIS CASE OR AT ANY PRETRIAL HEARING

HELD BEFORE ANY SUPERIOR COURT JUDGE FOR THE PURPOSE OF RULING

THEREON OR AT ANY HEARING OF SAID CASE AT WHICH SAID

DEPOSITION MIGHT BE USED, EXCEPT THAT AN OBJECTION AS TO THE

FORM OF THE QUESTION MUST BE MADE AT THE TIME SUCH QUESTION IS

ASKED OR OBJECTION IS WAIVED AS TO THE FORM OF THE QUESTION.

      6.   EXCEPT AS WAIVED BY THESE STIPULATIONS, THE

PROVISIONS OF RULE 30 OF THE NORTH CAROLINA RULES OF CIVIL

PROCEDURE SHALL APPLY TO THE TAKING OF SAID DEPOSITION AND AS

TO ITS SUBMISSION TO THE DEPONENT, CERTIFICATION AND FILING,

EXCEPT THAT NOTICE OF FILING IS HEREBY WAIVED.

      7.   READING AND SIGNING OF THE TRANSCRIPT OF

TESTIMONY BY THE WITNESS IS WAIVED.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### EXAMINATION OF THE WITNESS

BY:  MR. NORWOOD P. BLANCHARD, III      PAGES  5 - 50

BY:  MR. CARLOS MAHONEY           PAGES 50 - 54

BY:  MR. NORWOOD P. BLANCHARD, III      PAGES 55 - 57

Case 4:20-cv-00060-M   Document 31-4   Filed 05/28/21   Page 3 of 57

## INDEX OF EXHIBITS

DEFENDANT'S [37] MICHAEL SUTTON'S REPORT       PAGE 6

DEFENDANT'S [38] TRIAL AND DEPOSITION LIST       PAGE 5

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1          MICHAEL SUTTON, BEING BY ME FIRST DULY AFFIRMED TO

2     SPEAK THE TRUTH, DEPOSES AND SAYS:

3          ON EXAMINATION CONDUCTED BY MR. NORWOOD P.

4     BLANCHARD, III:

5          Q.   Good afternoon, Mr. Sutton. My name is Norwood

6     Blanchard. I am the attorney for the defendants in this

7     matter, the Estate of Cedric Pritchard versus Aaron Mobley and

8     the City of Washington, North Carolina, and we're here to take

9     your deposition today because I understand that you've been

10    retained as an expert witness by the plaintiff in this matter.

11    Is that correct?

12         A.   Yes.

13         Q.   You are familiar, I believe, with depositions,

14    because you provided a list of your trial and deposition

15    testimony, updated through March of 2021, within the last

16    couple of days; correct?

17         A.   Yes.

18         Q.   Okay. I'm gonna mark this one as Exhibit [38], if

19    that's all right.

20         A.   Sure.

21         Q.   Give you the opportunity to review that. Is that

22    list accurate?

23         A.   It is, yeah, so we just updated that for this

24    deposition. So should be pretty -- pretty up to date.

25         Q.   Okay. I want to go through your resume quickly here,

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1 I think, and also like for you to verify on the record the

2 document that we've marked as Defendant's Exhibit [37] is a

3 copy of the report you produced in this matter; is that

4 correct?

5       A.   Yes.

6       Q.   And your resume is not attached to this copy of it,

7 but it was attached in the copy that I was given earlier. I'm

8 just gonna go over that with you. For your educational

9 background, I believe you have listed a bachelor's degree in

10 mechanical engineering from NC State in 1988; is that correct?

11      A.   Yes.

12      Q.   And a Master's of Engineering with a concentration

13 in mechanical engineering, dynamics, vibrations and acoustics

14 in 1996.

15      A.   Yes.

16      Q.   Tell me what is a concentration in mechanical

17 engineering, dynamics, vibrations and acoustics?

18      A.   Right, so vibrations and acoustics is part of the

19 discipline in mechanical engineering. So mechanical

20 engineering is a broad discipline of engineering but is

21 basically applied physics, and part of that is vibrations and

22 acoustics, which are interrelated, of course, because

23 vibrating objects create acoustical energy. So at that -- at

24 that particular time, I was doing some work in the field of

25 acoustics so that kind of fit hand in hand with my education.

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1     Q.    And for employment, I want to talk about your

2  employment. Looking at your resume, the first job you had

3  listed was working for CPNL at the Shearon Harris Nuclear

4  Power Plant. What -- In January looks like you worked there

5  about little over a year and a half in early 1986 to the fall

6  of 1987.

7     A.    Correct.

8     Q.    What -- What did you do there?

9     A.    That was an engineering co-op position so it's

10  basically alternating semesters at work and study through the

11  North Carolina State University. That's basically how I paid

12  my way through college, but I was in the reactor engineering

13  department, so it was during the construction of that plant.

14  So I worked with Ford, with nuclear engineers on all the

15  aspects of getting the plant online. So it was just

16  engineering, it's like an internship position.

17     Q.    And then it looks like after you graduated, you

18  graduated, got your undergrad degree in 1988, I guess May of

19  '88.

20     A.    December. December of '88.

21     Q.    December of '88, okay. So you're still in school and

22  you took a job while you were still in the school as a

23  technician for Accident Reconstruction Analysis, Inc.; right?

24     A.    Yes.

25     Q.    And your -- your resume describes this as assisting

1  engineers with investigation and testing of accidents and

2  failures.

3      A.   Yes, right.

4      Q.   What kind of accidents and failures are we talking

5  about?

6      A.   All different kinds. Motor vehicle, aircraft, fires

7  and explosions, product failures.

8      Q.   And then after graduation, looks like in February of

9  '89 to 2001, you worked as a consulting engineer for the same

10 company; correct?

11     A.   Yes.

12     Q.   And so you just stayed on with them and then from

13 February of 2001 to the present, you've been with a consulting

14 engineer with Accident Research Specialists; correct?

15     A.   Yes.

16     Q.   Now your description of your -- your employment

17 background in your resume, it's technical investigation and

18 analysis of accident and failures involving vehicles and

19 machinery.

20     A.   Yes.

21     Q.   And as examples, vehicle accidents, you gave

22 commercial vehicles, heavy trucks, autos, motorcycles, marine

23 vessels, bicycles, pedestrian vehicle, and aircraft. Also

24 heavy equipment accidents, construction accidents, and product

25 failures and testing. Now in this case, I guess this is a

1 little bit of a different area than what you are typically

2 testifying in; correct?

3     A.   Yeah, it would -- As far as shooting cases go, I may

4 -- Well, I've got three going on right now, but you know,

5 usually typically it would be maybe one or two a year would be

6 a shooting case. I'm not saying like a products case involving

7 a firearms manufacturer, but like an actual shooting incident,

8 yes.

9     Q.   And I was getting ready to move into that -- into

10 your -- into your shooting ones. On the last four-year list

11 you gave me, it looks like you were involved in the Morgan

12 versus Wake County Sheriff's Office case; correct?

13     A.   Yes.

14     Q.   And I think that one ended up going to trial; right?

15     A.   Yes.

16     Q.   Tell me what -- what were you retained to testify

17 about in the Morgan case?

18     A.   Do some -- I did some videotape analysis. I did some

19 timing, positions, speeds, sequence of events, those types of

20 things, just basically in the world of looking at time,

21 distance, position, basically just reconstructing the layout

22 of an incident and potentially comparing that to different

23 eyewitness statements or deposition testimony.

24     Q.   And you indicated you had three of them, I think you

25 thought going on right now; is that right? Three or four? What

1  are the other ones?

2      A.    Three -- Three currently right now. So I have one

3  that involves the Nash County Sheriff's Department and one at

4  City of Greenville. Greenville, North Carolina.

5      Q.    And what's the nature of your -- your -- your

6  reports in those? What are you being asked to testify about or

7  opine about?

8      A.    Similar issues, which would be physical

9  reconstruction of data in the way, like a videotape. Also

10 times, positions, angles, again, anything that's in, say, the,

11 you know, mechanical engineering umbrella of these types of

12 incidents.

13     Q.    And I guess I'm gonna try to narrow this down for us

14 a little bit and -- and just to -- so I can move some things

15 off the table on it. You're not -- You don't have any

16 background in medicine; correct?

17     A.    Correct.

18     Q.    So no medical opinions, no causation opinions on

19 medical issues, anything like that?

20     A.    No.

21     Q.    Okay. And I notice that you did not appear to have

22 any type of law enforcement background; correct?

23     A.    Correct.

24     Q.    So you aren't offering any types of opinions on the

25 appropriateness of the use of force, for example.

1    A.   Correct, I will not.

2    Q.   Okay. So and let's move on to this case right here.

3  I got a copy of your report and looked through it and I want

4  to walk through that with you, but just in a general overview,

5  you know, what would you describe as the nature of your --

6  your review of this matter?

7    A.   My job here was to break down the video, the dashcam

8  video from Officer Mobley's vehicle and assign distances,

9  times, angles in conjunction with some of the other physical

10  evidence just to be able to answer questions about the

11  sequence of events or details of the incident. And they're

12  pretty much, as you've seen, they're all outlined in the

13  report.

14    Q.   Well, the primary piece of reference material I

15  guess you used or evidence you used then is the -- the dashcam

16  video; right?

17    A.   Yes, that's one part. So that's -- that's -- that's

18  obviously a datastream. The other is the photographs that were

19  taken. Still photographs that the SBI took. And third, is the

20  actual physical incident site itself, which still exists today

21  as far the sidewalk and the roadway and the curb and gutter

22  and the house. So, you know, so what you can do is you can go

23  gather that -- that environment today and then you can overlay

24  information from the video and the still shots.

25    Q.   From the video.

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1    A.    Yeah, right. And -- In the still shots are some

2  information that -- more information because you have all

3  these different photographs taken from different angles. And

4  then once you -- once you figure out what happened, then

5  you're in a position to compare what you find physically with,

6  say, what somebody may testify to or what a witness might say,

7  those types of questions. So that's the general process in

8  this case.

9    Q.    Have you actually been to the scene?

10   A.    No.

11   Q.    Okay. By the scene, we're -- we're talking about the

12  scene in -- in Washington, North Carolina; right?

13   A.    Yes.

14   Q.    So moving on to Exhibit [37], we've gone through

15  qualifications here, gone through your list of cases.

16  Compensation, your report indicates your current rate of

17  compensation is 325 per hour; is that right?

18   A.    Yes, that's correct.

19   Q.    Do you know how many -- how much time you have in

20  this?

21   A.    No, but I did -- we've sent two invoices on this

22  file and they should have been -- they should have been in

23  here somewhere. Did you see those?

24   Q.    I did not, but I wasn't --

25   A.    They were paper clipped to the subpoena. Well,

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1  somewhere in here.

2      Q.   Can you give me a ballpark figure --

3      A.   I would say it might be like 15 to 20 hours --

4      Q.   Okay.

5      A.   -- somewhere around in there.

6      Q.   Good enough. I don't want to --

7      A.   Yeah. It's -- It's in the file --

8      Q.   It's not a particularly important detail. I just was

9  wondering. And the documents and other information that you

10  reviewed is listed, starting on page 3 of your report; is that

11  correct?

12      A.   Yes.

13      Q.   And is that a comprehensive list?

14      A.   It is. The only thing that I would add in addition

15  which is something that's been added was just a court

16  document, Plaintiff's Expert Disclosures, where there's a

17  disclosure. Karen Kelly. I didn't necessarily rely upon that,

18  but it was just included in my file. There were some similar

19  findings between what Karen Kelly is saying and what we found

20  when we did the investigation.

21      Q.   And just to clarify for that, Dr. Kelly performed

22  the autopsy.

23      A.   Autopsy, yes.

24      Q.   I notice that you had a -- in the file that I

25  reviewed, a colored depiction of the gunshot injuries.

1    A.   Yes.

2    Q.   Is that right?

3    A.   Yes.

4    Q.   And it's a -- I don't know, I guess for lack of a

5    better description, a cross-section.

6    A.   Yes.

7    Q.   Showing bullet paths.

8    A.   Yes.

9    Q.   Now just to clarify on that, you are not somebody

10   who's offered expert testimony on ballistics, say, before;

11   right?

12   A.   I have. I'm not doing it in this case. But I have

13   done that in the past. But for instance, just so you know, and

14   I think it's in the report but so you're clear, say you look

15   at that medical illustration, what I did in this case was that

16   I just looked at that illustration in context with what we had

17   done. And there's some consistency with it, and that's in the

18   report, but I'm not doing any kind of ballistics or anything

19   other than just looking at the angle that the shot was fired

20   relative to how it struck the body, just a basic geometry

21   standpoint.

22   Q.   Now I'm looking at this -- at this photograph here

23   that's attached to the Plaintiff's Expert Disclosures, that's

24   entitled Summary of Mr. Pritchard's Fatal Gunshot Injuries and

25   in both of these the cross-section, for lack of a better

1  description, appears to show somebody just standing with their

2  feet squarely pointed in the same direction and -- and

3  stationary; correct?

4      A.   Yes.

5      Q.   Okay. And I'm -- I guess what I'm trying to do is --

6  is sort out whether you're claiming that -- that that

7  stationary position accurately depicts what was going on in

8  the field at the time, or -- or not. Was -- Was -- I mean, are

9  you here to testify that Mr. Pritchard was standing still with

10 his feet facing forward, squared up, at the time he was shot?

11     A.   No.

12     Q.   Okay. Are you here to offer testimony about his --

13 the relative position of his body, and I know that's a kind of

14 a loaded question. I know in your diagrams you have distances

15 approximated where you believe the officer was standing and

16 where Pritchard was standing, but I'm -- I'm talking about

17 whether he was twisted at a certain angle or not, as opposed

18 to how many feet apart they were. Does that make sense?

19     A.   Yes. And that is in the report. I mean, we can cover

20 that now or we can go to it.

21     Q.   Let's -- Let's -- All right, let's -- let's start

22 working in that direction. For your opinions here, and I'm

23 gonna just start at page 4 and work through this. It appears

24 that what you did was took the dashcam video, but the original

25 dashcam footage and the enhanced version created by the SBI

1   and used the timeline shown on the video; is that correct?

2       A.   Yes.

3       Q.   And you put together a timeline of events based on

4   that.

5       A.   Yes.

6       Q.   Okay. So on page 4, you start with Figure 1 and tell

7   me what this is.

8       A.   So this is the point where Officer Mobley begins --

9   and is that the way you pronounce his name?

10      Q.   Yes, Mobley. I think that's correct.

11      A.   Sometimes I want to say Mobley, but Mobley.

12      Q.   I'll make the same mistake.

13      A.   Mobley began to pull forward at the intersection.

14  So, you know, it's -- it's -- there's not really anything

15  happening, other than that, but what the idea was is that, you

16  know, I'm sure you've sat and watched this videotape a bunch

17  of times. And the idea was is to create a chart that we put on

18  page -- somewhere in here. Page 11, it's printed out in my

19  file, too, but basically do a chart which is a -- which is a

20  summary of these important events in the -- in the incident

21  events. And then index the time differently. It's just a time

22  counter on the video but we indexed it to an instant of

23  importance, which would be when the first shot was fired.

24      Q.   First shot.

25      A.   Right, so that way --

1    Q.   I -- I noticed on page 11, I was gonna ask. You used

2  that -- that is time zero when the first shot is -- is fired

3  and your reference point for the first shot is a plume of

4  smoke from Mobley's firearm --

5    A.   Yes.

6    Q.   -- discharging. And the time you have on that, and

7  I'm just using the second column, 47.2.

8    A.   Yes.

9    Q.   So just to move into your -- into your report,

10  that's depicted on page 9 of your report; is that correct?

11    A.   Yes, that's correct.

12    Q.   So we've got on the top of page 9, you have the

13  enhanced video. The enhanced video is on the right-hand side

14  and the -- what -- what's on the left?

15    A.   Well, the enhanced video is on the right and then

16  just the standard video is on the left. And this is pulled

17  straight from the SBI file, so we didn't do anything with the

18  video or the shot -- or the screen captures taken from the

19  SBI. That's coming straight from their -- from their files.

20    Q.   So I guess your opinion would be that in -- in --

21  and I'm gonna use the top photos on page 9, the one on the

22  right, the enhanced one, has the -- the time of 47.1; right?

23    A.   Correct.

24    Q.   Gun hasn't -- The service weapon, the officer's

25  service weapon, hasn't been fired at that point; right?

1    A.   Correct.

2    Q.   But we can actually see what appears to be the exact

3 moment or within a tenth of a second of when the firearm is

4 discharged in the very next set of frames at the bottom of

5 page 9; right?

6    A.   Yes.

7    Q.   Because and how can you tell that? The plume of

8 smoke coming out, right?

9    A.   Right, and if you -- if you look at his firearm,

10 it's now kinda in a raised position like it recoiled.

11    Q.   It's recoiling up, it's kicking.

12    A.   Right.

13    Q.   And in that photograph, both on the top --

14 photograph on page 9, the top set and the bottom set, you can

15 see the decedent in the edge of the picture; right?

16    A.   Yes.

17    Q.   Okay. And if I understood you earlier the way you

18 described the general process here, you used these angles,

19 these items that were shown in the pictures from the SBI

20 report, the video, to be able to kind of recreate a scene

21 showing your estimates of where the officer was standing;

22 right?

23    A.   Yes.

24    Q.   Where the officer's car was parked.

25    A.   Yes.

1    Q.    Where the dashcam video in the officer's car is

2    located.

3    A.    Yes.

4    Q.    Relative to the suspect vehicle.

5    A.    Yes.

6    Q.    And I'm talking about the vehicle as that blue

7    Aztek; right?

8    A.    Correct.

9    Q.    And the frame of view of the source tape.

10    A.    Yes.

11    Q.    The angle view. I noticed in one of your pages --

12    where is it? You have an approximation of what you think the

13    field -- there it is. Page 15, right?

14    A.    Correct.

15    Q.    So on my color version of this, kind of the -- I

16    don't know what colors you would call that.

17    A.    Fuchsia? I don't know.

18    Q.    Fuchsia. Right. The reddish purplish color is the --

19    A.    Magenta, how about that?

20    Q.    Magenta sounds right. Magenta is -- is the -- your

21    estimation of the dashcam field of view and you use -- the way

22    you figure that out was by looking at the pictures of the

23    house and the street; is that correct?

24    A.    It is and so once we had a scan world, and when I

25    say scan world, so and by the way, Michael Whitley, who's an

Case 4:20-cv-00060-M   Document 31-4   Filed 05/28/21   Page 19 of 57

1 engineer here, did the field work and he did -- he helped me

2 on this case. So Michael went down, scanned the -- the house

3 and the yard.

4     Q.   Did -- Did he actually go to the site or I was --

5     A.   Yes.

6     Q.   -- wondering did he -- did he --

7     A.   Yes.

8     Q.   -- use a Google map?

9     A.   No, this is a three-dimensional scan. So we took a

10 scanner down there and the scanner collects just points of

11 data, millions of points and then that creates a three-

12 dimensional world that you can move around in that's to scale.

13 And then we have three-dimensional models of the Explorer and

14 of the Aztek. And then we located those based on still shots.

15 I mean, you can see cracks in the pavement that are still

16 there, things like that. Distances from curb. Then once you

17 get that, you can put the camera inside the Explorer and line

18 up the camera until you're looking at the exact same thing the

19 video shows.

20     Q.   And that's what I wanted to ask you about, the

21 camera, the location of the camera. And I'm -- I'm gonna start

22 page 15. The way you have, in page 15, the patrol car and the

23 suspect vehicle oriented in there, I -- I want to ask you

24 about some measurements there. And you've got a copy of

25 Exhibit [37]. Can you tell me how far, distance wise, it would

Case 4:20-cv-00060-M   Document 31-4   Filed 05/28/21   Page 20 of 57

1 have been from the front bumper of the patrol car, in the

2 middle of it, to the rear bumper of the suspect vehicle?

3     A.   Well, it's about 15 feet and if I didn't put it in

4 the report, you know, that's something that would be easy to

5 do. The problem is I don't have like a scale 2 dimensional

6 diagram. We just have the scanned world, which means that I

7 can pull up the scan and measure. If you said, hey, how far is

8 from point A to point B, I could tell you. I just don't have

9 it all printed out. If I didn't put that in the report

10 already. So I can give you approximate distances, just based

11 on, you know, what's in the report, or if you want to know the

12 specific distance, I can get that for you.

13     Q.   An approximate one will be good -- and by the way,

14 just to get to that issue, how close can you give, based on

15 the information that you've got, an approximation on that

16 measurement?

17     A.   As far as the measurements go, they're -- as far as

18 like field of view, where the cars are located, probably

19 within like six inches or so. Pretty close. I mean, the data

20 itself, like I mean, as far as, you know, the width of the

21 sidewalk and stuff like that, it's gonna be -- it's gonna be

22 spot on. You know, you're positioning a car based on some

23 photographs and so you're probably within, say, six inches.

24 When you're using the videotape, the videotape is at 10 frames

25 per second, so you're taking basically, you know, these, you

1 know, these basically tenth of a second, if you want to think

2 about it that way, slices of reality. So there you might be

3 off a little bit, depending on what's going on, you know, for

4 --

5      Q.    The speed that people are moving.

6      A.    Exactly. So --

7      Q.    The speed is not always consistent all the way

8 across. They'll speed up, slow down.

9      A.    They could do that, right. So you have to take that

10 into account, like, you know, if you said, you know, precisely

11 how far did the officer move during these two time period, it

12 would be a range, you know. It may not -- It may not matter,

13 but it would be -- you would have to calculate a range. It

14 might be a foot or something but --

15      Q.    So you can tell a beginning point and an end point,

16 but like you said, in those small slices of time in between,

17 you don't know necessarily whether he was moving a little

18 faster or a little slower.

19      A.    Correct. Typically, when you do video analysis,

20 because of the frame rate of most video cameras, there is a

21 range at each point in time that you're collecting data.

22      Q.    Back to -- to page 15. And the reason I'm asking

23 about this is that looking at the depiction of the location of

24 the dashcam, and is that your best estimation of where the

25 dashcam was located in the patrol car?

1     A.   Yes.

2     Q.   Either in the middle of the patrol car or slightly

3 to the right of center?

4     A.   That is correct.

5     Q.   And let's back up to page 10, for example, and I'll

6 ask you about this, about location of the -- in -- in the

7 photographs, and I'm talking about the source, the original

8 ones, not the enhanced ones. In both of these there's a very

9 -- I mean, would you agree there's an unobstructed view down

10 the right-hand side, the passenger side of the suspect

11 vehicle? Right?

12    A.   Oh, you talking about like looking into the

13 distance?

14    Q.   Right.

15    A.   Yes, because it's just open street there.

16    Q.   Okay. So I can see what appears to be the front

17 mirror, for example.

18    A.   Yes.

19    Q.   On -- On the passenger side.

20    A.   Correct.

21    Q.   Now you can't see that on the driver's side for a

22 couple of reasons. One, the door's open, right?

23    A.   Right.

24    Q.   But even if the door were shut, it appears that your

25 view down the driver's side of the car is not quite as good as

1   it is down the passenger side, right?

2       A.   Correct. And you could probably see that if you look

3   back at 15. You can see why that is.

4       Q.   Because of the relative location of the patrol car

5   and the suspect car, right, the way they're angled close to

6   each other.

7       A.   Yes, so there's, you know, say the close to the

8   passenger side of the Aztek, you might miss some things 'cause

9   of the -- the left rear corner of the car is there.

10      Q.   Now the driver of, in this case, the officer, it's a

11  standard car that's on American roads, right, the steering

12  wheel is on the left-hand side.

13      A.   Yes.

14      Q.   Okay. So he's got a better view looking down the

15  driver's side of the suspect vehicle than the dashcam video,

16  doesn't he?

17      A.   Yes, his -- his view is a different -- is a

18  different vantage point, right, so I mean, and I don't want to

19  qualify that as a better view, but for instance, he would be

20  able, because he is to the left of the car and looking back

21  towards the driver's side of the car, for instance, he would

22  be able to see inside the door opening, whereas the dash

23  camera --

24      Q.   Can't.

25      A.   -- can't. It can, you know, you can look at it

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1  there. You can basically see down the driver's side, but you

2  can't see in the car --

3      Q.   Can't see in the car.

4      A.   -- from the angle.

5      Q.   Can't see what his leg, for example, is doing, the

6  suspect, I mean, if he's -- if there's a person sitting in the

7  driver's seat of that suspect car, the door comes open, the

8  dashcam video won't be able to see his left leg, right?

9      A.   That is correct, not until he -- not until --

10     Q.   Not till he gets out.

11     A.   -- it protrudes from the door, which is the first

12  thing you can see when he's getting out of the car.

13     Q.   But on the other hand, and you -- you talk about the

14  officer's perception later in your report so that's why I want

15  to get into it right here. When the officer gets out of his

16  car, based on where he would have been standing, to clear

17  around his door, for example, his open door, he has to go out,

18  what, three feet?

19     A.   Yes.

20     Q.   Okay. So in your example, page 13, for example,

21  let's use that, the aerial view of it. You've got this arrow,

22  a blue arrow, right?

23     A.   Yes.

24     Q.   And what is that -- that blue arrow is -- is showing

25  your approximation of the officer's foot path?

1    A.   Yes.

2    Q.   Okay. So wherever his foot path starts, and it's a

3    straight line in this, but in truth it would be coming out of

4    the vehicle at an angle first and then turning, right?

5    A.   Correct.

6    Q.   Okay. So he's gonna be at least a door width and you

7    know, I think you -- you saw from the deposition, didn't you

8    record a -- review Mobley's depo?

9    A.   Yes.

10   Q.   Transcript? He's a pretty big fellow.

11   A.   Yes.

12   Q.   So he would have had to come around that.

13   A.   Yes.

14   Q.   Okay. And again, that changes his vantage point

15   relative to the vantage point of the dashcam, right?

16   A.   Yes, it's a different vantage point.

17   Q.   So early on in this situation, and I -- I think

18   you've got a good timeline together. Let's go back to -- what

19   page is it on, your timeline?

20   A.   Eleven. Eleven.

21   Q.   From the time the vehicles come to a final stop to

22   the time zero, is less than eight seconds, right?

23   A.   Yes, so yeah. Richard comes to a final stop, yeah,

24   7.7 seconds from the beg -- from the first shot.

25   Q.   Okay. And then it takes approximately five seconds,

1  5.4 seconds, is that your estimate, before the driver's door

2  of the Aztek starts to open?

3      A.   It's 5.4. From the last -- from the last point we

4  were talking about.

5      Q.   Right. So vehicle comes to a stop. Five point four

6  seconds later, based on this timeline you've got, the driver's

7  door of the Aztek begins to open and you base that on -- on

8  seeing shadows in the video, right?

9      A.   Yes, you see the shadow of the door moving.

10      Q.   The door sliding open.

11      A.   Yes.

12      Q.   And then the next thing that you have in your

13  timeline is Mobley's right hand appearing on the edge of the

14  frame and Pritchard's head out. Take me to the picture where

15  that starts.

16      A.   Okay. That's the top of page 7.

17      Q.   So the shadow that we're talking about that you see

18  moving is on the bottom of page 6.

19      A.   Yes.

20      Q.   What's the difference between the photograph 0395

21  and 0449? Where is the shadow moving in it?

22      A.   Yeah, so there's -- this little hump appears right

23  here. So if you look at this versus this. And then if you go

24  -- you can kinda see it more here. Like for instance --

25      Q.   Into the next page, we're talking about --

1     A.   You can actually see the whole --

2     Q.   -- 455.

3     A.   Four -- 455 you can actually see like the entire

4  door now. Like you can see the window frame and stuff like

5  that. That's when the door is open.

6     Q.   All the way open.

7     A.   Yeah.

8     Q.   So in the photograph #455, you pointed out Officer

9  Mobley's hand, right hand, appears on the edge of the frame

10  and Pritchard's head is visible exiting the vehicle, right?

11     A.   Yes.

12     Q.   Okay. So from the dashcam video and this one at 45.5

13  seconds, it's fair to say that Mobley is already out of his

14  car, right?

15     A.   Yes.

16     Q.   And based on your description a minute ago, him

17  having to round the door, he's already come around the door.

18     A.   Yes.

19     Q.   Already rounded the door and, in fact, his right arm

20  is in view of the dashcam.

21     A.   Correct. Yeah, he -- you can tell by here he's, you

22  know, like at the left front corner of the police car.

23     Q.   So he can see based on your analysis of this, he can

24  see Pritchard -- he would have been able to see Pritchard

25  getting out of the vehicle, right?

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1    A.    Yes.

2    Q.    Would have had a clear and unobstructed view of him,

3   based on this?

4    A.    Yes.

5    Q.    And could see in the car door, when the car door

6   opened?

7    A.    Yes.

8    Q.    Based on where he would have been placed in your

9   video. I mean, if we're looking at his right hand, the rest of

10  his body is to the left of that.

11   A.    Yes. Yes, he should be visible.

12   Q.    Okay. But the dashcam can't see inside the car.

13   A.    Correct.

14   Q.    And in fact, doesn't have a real good view of what

15  comes out first, based on the shadows and all that, right?

16   A.    Yes. You have to watch the video carefully, yes.

17   Q.    Let's drop down to the one on page 7, the enhanced

18  and standard videos, numbered 457. Now on the enhanced video

19  version of it, is that red circle something that the SBI

20  placed there or did you place that?

21   A.    The SBI placed that.

22   Q.    Do you know what it denotes?

23   A.    That should be his right hand, so from what I take

24  it, they are indicating what they believe, again, based on

25  Officer Mobley's testimony, that's -- that's the pistol that

Case 4:20-cv-00060-M   Document 31-4   Filed 05/28/21   Page 29 of 57

1  Mr. Pritchard had.

2      Q.   Well, let me ask you about that. You've reviewed the

3  video. Is there a pistol there or not?

4      A.   There's an object in his right hand. I can't tell

5  you it's a pistol or not, but there appears to be an object in

6  his hand in that frame, and then there's another frame when

7  he's in the act of running.

8      Q.   And there's an object --

9      A.   There's an object in his right hand, but I think --

10 I've looked at the video carefully. I don't think the quality

11 of the video is good enough to tell you what it is. So, you

12 know, we have Officer Mobley's testimony on that.

13     Q.   But you'd agree there is an object in his right

14 hand.

15     A.   Yes.

16     Q.   And having an opportunity to look at the video, the

17 object in his right hand would be smaller than a football,

18 right?

19     A.   I would think so.

20     Q.   Did you see an SBI photograph of a gun recovered

21 from the scene, a revolver?

22     A.   Yes.

23     Q.   The object in Mr. Pritchard's right hand when he

24 gets out of the vehicle consistent with the size of that

25 handgun?

1      A.   I think it would be, yes.

2      Q.   But your point is you just can't tell clearly from

3  the video.

4      A.   Correct. I mean, from the video itself, you can't

5  tell. But, you know, we, you know, there was a gun found near

6  Mr. Pritchard, you know. He had a bag of 22 shells, had a bag

7  of Cheetos. I mean, so obviously, there could be multiple

8  things, but you need to look at more than the video to try to

9  figure out which is the most likely, you know, likely object

10 he's holding in his right hand.

11     Q.   Well, have you got an opinion on what the most

12 likely object in his right hand is?

13     A.   I think it's either the pistol or potentially the

14 bag of bullets, but you know, you can't -- you can't tell what

15 he's got. But Officer Mobley said that it was the pistol,

16 right, and so I can't look at this video and say well, it was

17 not. So, you know, him -- him saying that he had the pistol in

18 his right hand is consistent with the video, but I don't know

19 what it is.

20     Q.   And I think you hit on the other point right there,

21 is that Officer Mobley's vantage point for determining that,

22 at least, is superior to the dashcam video, right?

23     A.   Yes.

24     Q.   Let's just use time and distance, since you're part

25 of the thing you're being asked to testify about. What's the

1  distance between the dashcam, the location of the dashcam, if

2  you know, and let's just start with the hand coming out on

3  page 7?

4      A.   I think it's about 30 feet.

5      Q.   So how much closer, and I think we all agree that

6  Mobley's closer. How much closer is he than the dashcam?

7      A.   At the time the hand is visible?

8      Q.   Yes.

9      A.   Or like say in 459?

10     Q.   Yes, 459.

11     A.   He's probably, I'd say, eight or nine foot closer,

12  so he might be 20 feet.

13     Q.   He's -- obviously he's got to be beyond the front of

14  his own car, right?

15     A.   Correct.

16     Q.   We can see from the video that he's out in front of

17  his own car.

18     A.   Yes.

19     Q.   So one, he's got a better angle to see it, and two,

20  he's closer, on top of that, right?

21     A.   Yes.

22     Q.   And the other thing is based on his testimony, he's

23  focused on that, isn't he?

24     A.   Yes.

25     Q.   But the dashcam, well, that just shows whatever's in

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1  the picture, right?

2      A.   Correct.

3      Q.   Just to get this point, the information you used to

4  analyze these things, and we're -- we're looking through this

5  right here, but so far up through page 7, through page 8, 9,

6  10, and even 11, the chart, all of that information comes from

7  the dashcam video.

8      A.   Yes.

9      Q.   I mean, that's the one thing that's present in every

10 one of those estimates, isn't it?

11     A.   That's correct. So that was the first thing to do

12 was to establish the timeline.

13     Q.   Moving on to page 13 of this, so we -- we have a

14 diagram and again, we talked a little bit about this diagram,

15 but this is -- this is the approximation that you had prepared

16 of the relative path of Pritchard and Mobley, right?

17     A.   Yes.

18     Q.   Now, and again, I probably have already asked this,

19 this is shown as a straight line but in reality, they may -- I

20 think you agree that they didn't necessarily move in exactly a

21 straight line, right?

22     A.   Correct. So the idea here was is that we know, for

23 instance, if you look at the Aztek, we know where Pritchard

24 ends up.

25     Q.   Right.

1      A.   We know he has to clear the door and so the door is

2  opened the correct way, as it's shown in the picture, so

3  that's his path. But his path could have -- there's not a lot

4  of time here between those two, but there could -- there could

5  be deviation either way.

6      Q.   A minor devia -- Could be a deviation off that

7  straight path. He wasn't necessarily running a straight line.

8      A.   Right. Could be a curved path. And the same thing

9  for Office Mobley, like we've already talked about.

10     Q.   He had to come out of the door, for example, so

11 there would have been a curve there.

12     A.   Right.

13     Q.   He could have stepped -- You have him stepping up

14 onto the pavement, for example. He could have stepped sideways

15 getting onto the pavement, right?

16     A.   Right, so the determination of the blue arrow for

17 Officer Mobley is where he -- where he basically is in the

18 video, right? So we know his end point but you can, again, we

19 know he goes around the front of his car. So it's just kind of

20 the same idea there, that there could be some variation in

21 that.

22     Q.   So and let's back up. In shot number one, I think we

23 established from your testimony earlier that your opinion is

24 that the first shot was fired between, and I'm gonna use the

25 timelines from the enhanced video, 471 and 472.

1      A.   Yes.

2      Q.   Right? So in that one-tenth of a second is when the

3 shot's fired, the first shot.

4      A.   Yes.

5      Q.   And you can already -- I think you said, see a

6 muzzle blast and what appears to be some recoil in 472?

7      A.   Yes.

8      Q.   Now in the picture of -- the left-hand picture on

9 the bottom of page 9, the videotape version of it, not the

10 enhanced version.

11      A.   Yes.

12      Q.   You get -- You can get a rough approximation of

13 Officer Mobley's location there, right?

14      A.   Yes.

15      Q.   Okay. So is he -- and I'm gonna ask you, do you

16 think he is just about even with the back of the Aztek?

17      A.   Yes. And I think that's -- it should be depicted

18 later on. We haven't quite got there yet.

19      Q.   Well, let's go to that one. Okay, page 18?

20      A.   Page 18, yes.

21      Q.   And I was gonna ask you about that because the first

22 shot trajectory you have on page 18, you've got this -- the

23 red line, right?

24      A.   Yes.

25      Q.   Okay. Now based on the picture that I just looked --

1  just went at with you on page 9, he appears to be a little

2  closer to the back of the Aztek than your red line would

3  depict; is that accurate?

4      A.    Well, that's what it looks like on the video, but I

5  know -- I know Mr. Whitley worked through this and, you know,

6  we both looked at this. He's lining up other things, so

7  sometimes when you do this, it's hard to really tell what that

8  distance is, but I would agree with you. If you'll get Figure

9  13 on page 9, to me, if you just eyeball it, it looks like

10 that Mobley is closer to the rear bumper than this line here,

11 but again, you know --

12     Q.    Even so, it's not more than a foot or so difference

13 between --

14     A.    Yeah.

15     Q.    -- either one, right?

16     A.    Right. And then you also gotta remember that that's

17 probably just the position of Mobley's body versus his

18 outstretched arms and, you know, so it's really close. But I

19 know what Mr. Whitley was doing was using the scan to place,

20 you know, the positions that, for instance, you see in Figure

21 19, as close as we could get them.

22     Q.    And Figure 19, the other thing I'm looking, Mobley's

23 feet appear to be up on the grass and I don't know if they

24 would have quite been there in the -- in the Figure 19 you've

25 got.

1    A.   Yeah. They -- They were, 'cause I remember he was --

2  he was stepping up onto the grass from the -- from the roadway

3  when, you know, basically at the time that first shot was

4  fired, if I recall. I think that that's -- I mean, again, I'd

5  have to go back and look at it specifically. Yeah, for

6  instance, if you look at --

7    Q.   Well, Figure 20 seems to show it a little bit more

8  in line with what -- with what we were just talking about on -

9  - on page 9.

10    A.   Yeah, I would agree with that. So huh! I just

11  remember going through this and making sure that we had it

12  right, and I'm sitting here looking at Figure 19 right now and

13  I kinda agree with you. It looks like that the red line starts

14  too early there. 'Cause I remember us using that step up by

15  Mobley versus when you see the smoke coming out of the weapon

16  to -- to -- to locate that first shot. So I mean, I would have

17  to go back and look at that.

18    Q.   I mean, either way though, you'd agree there's not a

19  whole lot of difference between those two; a foot, maybe two

20  at the most, right?

21    A.   Correct.

22    Q.   But it appears -- he appears to be on the side -- or

23  not the sidewalk, but on the grass when the first shot is

24  fired.

25    A.   That's correct.

1    Q.   Can you approximate how long, and you've got this

2  red line. Let's use Figure 20, the -- the first shot bullet

3  trajectory. How far it was from the outstretched arms, from

4  the muzzle of the gun, because we're talking about a

5  relatively small distance here, aren't we?

6    A.   Yes.

7    Q.   Outstretched arms of the officer and the muzzle of

8  the gun to the decedent at the time of the shot.

9    A.   I think that's in the report, actually. Hold on.

10 Okay, they were 20.4 feet apart, according to us. I'm looking

11 at Figure 22 on page 22. So, yeah, first shot Pritchard was

12 approximately 20.4 feet from Officer Mobley.

13   Q.   Okay. Now how far is the dashcam from Pritchard?

14   A.   Oh, at that particular point? I am going to say it's

15 the length of both cars plus the 15 feet between them. So it's

16 going to be roughly 45 feet, maybe -- maybe 45 to 50 feet.

17   Q.   So the dashcam is looking at it from 45 -- looking

18 at Pritchard from 45 or 50 feet away and on the other hand,

19 Mobley is looking at him from 20.4.

20   A.   That is correct.

21   Q.   Right?

22   A.   Yes.

23   Q.   And if we're dealing a guy's arm being stretched

24 out, and I'm -- we can't show this on a -- on a -- on this --

25 this transcript, but I'm holding my right arm behind my back

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1    like it's being shown in the pictures on page 9. There's a

2    clear view, clear line of view from Officer Mobley to that

3    hand coming back, isn't it?

4        A.   Yes.

5        Q.   Now that's one thing the dashcam video can tell us,

6    is that Mobley's looking squarely at him.

7        A.   Yes.

8        Q.   Unobstructed, it's daylight.

9        A.   Yes.

10       Q.   No reason to believe he couldn't see what was in his

11   hand.

12       A.   Correct.

13       Q.   But I think we've established from your testimony

14   earlier the quality of the video is not good enough for you,

15   at least, reviewing it, to see what's in his hand.

16       A.   Correct.

17       Q.   Could have been a bag of bullets, could have been a

18   gun.

19       A.   Yes.

20       Q.   But it was smaller than a football.

21       A.   Yes.

22       Q.   Well, let's move on to your opinions in this. Walk

23   me through 'em.

24       A.   Well, we've -- we've covered the first part, which

25   would be through page 11, which is timing. I guess opinion

1  number 5 is also timing. I think it's pretty self-explanatory.

2  Number 6, we noted that there were two events that

3  corresponded at the same time, which was when Officer Mobley's

4  hand was first on his firearm corresponded to the time that

5  Pritchard was out of his vehicle but still at the door. So

6  basically, when Pritchard's feet hit the ground is the same

7  time that Officer -- Officer Mobley's hand is on the weapon,

8  just from the videotape. So therefore, what -- instead of

9  having to repeat all those times, it's just the same times.

10     Q.   And just to fill in right there, I think we

11  established from your testimony earlier that Mobley's vantage

12  point at the time would have allowed him to see into the car

13  at that time.

14     A.   That's correct.

15     Q.   Better than the dashcam video would, at least,

16  right?

17     A.   Yes.

18     Q.   Go ahead.

19     A.   Seven is more timing. Eight talks about what I

20  described before, which is using video and photographs and a

21  3-D scan of the site and 3-D models of the two vehicles. We

22  created approximate paths and then a final rest position of

23  Mr. Pritchard. That's on page 13. Number 9 explains how we

24  placed the camera in the police car, which we talked about,

25  which is what's shown on page 15.

1    Q.   The field of view.

2    A.   The field of view, right.

3    Q.   I think you were -- Number 9 talks about using the

4  window and utility pole to establish a field of view.

5    A.   Yes. And then --

6    Q.   So that's what you did, you basically looked at the

7  corners of what's shuttered up --

8    A.   Exactly.

9    Q.   -- to get an angle of the --

10   A.   Right, and then since -- then -- then you can draw

11 on the scan, which is what we did, where we looked at on page

12 15. That's the field of view of the dashcam. And then, for

13 instance, since we know the first shots fired and Pritchard is

14 just going off camera, and you know his approximate path, you

15 can pretty much figure out where he would have been when he

16 shot. But I think that's coming up. Okay, so number --

17   Q.   Interrupt you there, I'm just wondering about this

18 dashcam thing. Is there -- Is there a published field of view

19 for -- for these dashcams?

20   A.   Probably not field of view, but you could get --

21   Q.   I mean, angle, degree angle.

22   A.   It depends on like how -- how much, you know, like

23 the specifications. I know I get -- I work for the train

24 companies a lot and then like I have all the specs but I had

25 to go to the manufacturer to get those. It's not -- can't like

1  go to Google and Google it, but you can get it from the

2  manufacturer.

3      Q.   They could tell you exactly how many degrees that

4  camera can see, right?

5      A.   Yes.

6      Q.   The -- The -- Okay, go ahead. I'm sorry. I think we

7  were up to number 9 or so.

8      A.   Ten, I think.

9      Q.   Ten.

10     A.   So -- So number 10 talks about the average traveling

11  speed of Mr. Pritchard, which is 7.3 miles per hour.

12     Q.   But we also established that that's an average and

13  that he, at various times, was moving faster and slower,

14  right?

15     A.   Yeah. I would say, just looking at the videotape,

16  you know, he's moving slower than -- he had to accelerate

17  'cause he goes from zero to whatever he's running. So this

18  would be less than his top speed. When you look at his average

19  speed, obviously, and then so, you know, walking is three

20  miles per hour. Jogging is four to six miles per hour. His

21  average mean speed is 7.3 and we know it has to be higher

22  'cause he started from --

23     Q.   From zero.

24     A.   -- from zero, so he's running. So I mean, that's

25  really all that number 10 says.

Case 4:20-cv-00060-M   Document 31-4   Filed 05/28/21   Page 42 of 57

1    Q.   Okay.

2    A.   The videotape shows he's running. Let's see. Eleven

3  is that based on the medical examiner's information and

4  graphically shown in the medical illustration, that the

5  gunshot wound to his, basically the rear of his torso, was 35

6  degrees and that the one that struck him in the right buttock

7  was 15 degrees and that's just -- that's purely just the data

8  that we were given. And then what we -- what we did was -- is

9  that looking at the videotape, you can see the position of Mr.

10  Pritchard's body when he's shot the first shot, 'cause we saw

11  that, the frame right before, the frame right after. You can

12  see the position of his body and placing Mobley close to the

13  rear of the Aztek, as we've discussed, and putting Pritchard

14  on the edge of the field of view of the camera on his path,

15  that -- the angle between the two of them there is, you know,

16  close to 35 degrees. So it's my opinion that the first shot

17  that was fired is the one that went through -- basically,

18  through his center of mass, you know.

19    Q.   Okay.

20    A.   So that's what that is. Let's see. And we talked

21  about since Pritchard goes off camera for the second shot, we

22  don't know what his position is, but, you know, you can

23  imagine he's probably changing position either by running,

24  'cause he's -- he's in mid stride --

25    Q.   He's been impacted, as well.

1    A.    -- and he got impacted by a 45, so that's obviously,

2   you would think that that would change his position. So this,

3   you know, so at some point in time the second shot is fired

4   within a half a second, and what we're saying there is that

5   both parties are gonna continue somewhat along their paths,

6   but we don't know the position of the body, you know, with as

7   much accuracy as you can when you have an actual picture of

8   the first shot with all the add-ons that I just told you about

9   with the first shot. Let's see. I don't think there's really

10   much else. And I think the last opinion, which was a question

11   that I was asked, which was -- there was testimony from Mr.

12   Mobley that he -- what he remembered seeing is like the

13   underarm and rib cage of the right side of Mr. Pritchard,

14   which I -- I do not think that that's possible, physically

15   possible.

16    Q.    Well, let's -- let's stop with that one then and

17   let's -- let me ask you a little bit about that. That opinion,

18   16, about what he saw. Now in the end that comes directly from

19   the video, right?

20    A.    Yes, and then, you know, we've tied everything

21   together, which is what the video is showing and that that

22   first shot that's made is the one that goes through his chest

23   and as you've been describing, we know that Mobley has a

24   better -- Mobley, because he's to the left of the dashcam, he

25   would be looking more at Mr. Pritchard's left side, right,

Case 4:20-cv-00060-M   Document 31-4   Filed 05/28/21   Page 44 of 57

1  then the dashcam is looking at --

2      Q.   He's closer, as well though, right?

3      A.   Right, he's closer. But the idea that -- that --

4      Q.   I mean, I guess, and just to belabor that point, he

5  would have also had a better view, if he turned at all, of his

6  right side, too, than the dashcam video would have.

7      A.   Oh, I think -- I think that -- that the officer had

8  a better view in all because we're just looking at a

9  videotape, but if you look at the physical evidence, there's

10 no way that -- that Mr. Pritchard can present his right side

11 to Mobley without you being able to see it, either in the

12 video or by the shot trajectory. The physical evidence is

13 inconsistent with him turning the way that it's described in

14 Mobley's testimony.

15     Q.   But now the physical evidence is consistent with him

16 having a clear view of the object in the decedent's hand,

17 right?

18     A.   Yes.

19     Q.   I mean, we can see that from the video, right?

20     A.   He should have a view of what -- what's in his hand.

21     Q.   Both immediately before and right at the instant of

22 the shot, right?

23     A.   Yes.

24     Q.   And -- And for 16, I'm just gonna, you know, throw

25 this out there. What is it about number 16, and I understand

Case 4:20-cv-00060-M   Document 31-4   Filed 05/28/21   Page 45 of 57

1   that you have, you know, diagrams of the relative locations

2   and all that. But me as an observer, or anyone else as an

3   observer of this video, can look at the video slowly, freeze

4   framed and draw our own conclusions about what Mobley could or

5   couldn't have seen just as well as you could have in this

6   situation, right?

7           MR. MAHONEY: Objection.

8       Q.   I mean, is that accurate?

9       A.   Not necessarily.

10      Q.   Well, tell me why it's inaccurate.

11      A.   Well, I think -- Well, I mean, if you would have

12  done the same thing that I did, you know, which if you broke

13  it down frame by frame and understand the timing in that, you

14  know, there's not enough time in between frames -- like if you

15  knew the frame rate of the camera, it's 10 frames per second,

16  and you knew that there's not enough time in that 10 frames

17  per second frame rate for Pritchard to be in any other

18  position than what you see him in the videotape, then I think

19  you will conclude that he doesn't turn. But, you know, again,

20  looking at the consistency of the shot, the medical testimony,

21  all the distances and angles that I've done is just applying

22  the physical evidence to what you see visually in the video,

23  which I think what you just stated, to me, is pretty clear is

24  that especially with the different vantage point of the

25  officer, the part of Mr. Pritchard facing away from him is the

1  right side of his body. And so, you know, I know that was --

2  that's his recollection of what happened. It's just not

3  consistent with physical evidence.

4      Q.   And let's take a look at page 9 of your report, for

5  example. I mean, that -- does that distill it all down for us

6  what he saw at the time the first shot was fired? I mean, I've

7  got something that I think we've just testified that is no

8  more than one-tenth of a second before the shot and then no

9  more than one-tenth of a second after the shot. We have two

10  frames right there within one-tenth of a second of each other.

11     A.   Correct.

12     Q.   And the decedent in those -- how far do you think

13  the decedent moves, looking at the -- the two pictures

14  comparing 471 and 472?

15     A.   Not much at all, 'cause I mean, he's -- his planted

16  foot is still planted in both of them. You can look -- look at

17  his head relative to that window in the house in the

18  background and you kinda get an idea. It's not much. It's not

19  much at all.

20     Q.   And then backing up to 46.5 seconds, the page

21  before. In that six-tenths of a second, we can see how far

22  he's moved, right?

23     A.   Right, you can take -- you can take --

24     Q.   Just completely obscured by Mobley.

25     A.   Yes, and so, you know, you can take the average

Case 4:20-cv-00060-M   Document 31-4   Filed 05/28/21   Page 47 of 57

1  speed, which is in number 10, 10.8 feet per second, multiply

2  it by the time and that, you know, tells you. So basically a

3  foot every tenth of a second is -- the center of mass of

4  Pritchard is moving.

5      Q.   Now the problem here -- Let's take a look at Figure

6  11, 465. Let's look at 461 and 465. You can see Pritchard

7  getting out of the vehicle in 461, right?

8      A.   Yes.

9      Q.   And you got a clear view. You can see both the right

10 -- You can see his face looking at the officer, right?

11     A.   Yes.

12     Q.   Looks back at him.

13     A.   Yes.

14     Q.   See the front of his shirt, right?

15     A.   Yes.

16     Q.   In the next one, 465, he's completely obscured from

17 view, right?

18     A.   Correct.

19     Q.   So you, me, anybody else looking at this video

20 doesn't know exactly what Officer Mobley can see there, other

21 than Officer Mobley, right?

22     A.   Correct.

23     Q.   And then the next picture we have, 471 and 472, are

24 right at the instant of the shot, right?

25     A.   Yes.

1    Q.   So when Officer Mobley says he saw the right-hand

2  side of his body, you can't tell whether he did or not in that

3  picture that's shown as 465, can you?

4    A.   Not in 465, but I did go through this frame by

5  frame, so if you can look at, you know, 463, 4, 6, 7, I don't

6  have those printed out. But when I watched it, I never saw

7  anything that would be consistent with Pritchard turning to

8  his right. But this particular frame right here, you are

9  correct. He is directly behind the officer.

10    Q.   And we know that that is less than a second before

11  the shot.

12    A.   I think so. It's 46.5, right, so yes, seven-tenths

13  of a second.

14    Q.   The shot comes somewhere between 47.1 and 47.2.

15    A.   Yes.

16    Q.   Hadn't been shot at 47.1, it has been at 47.2.

17    A.   I think that's fair, yes.

18    Q.   You're not offering an opinion as to whether that

19  object shown in 471 and 472, as I understand it, was a gun or

20  that bag of bullets or something else, right?

21    A.   Correct.

22    Q.   So based on that, I think your testimony earlier we

23  just can't see well enough to tell from the video, right?

24    A.   Correct.

25    Q.   So it would also be fair to say that you can't see

1  well enough to tell whether if there was a gun, if the muzzle

2  was pointed at the officer, right?

3       A.   Correct.

4       Q.   He'd had a better view of that than we would have.

5       A.   Yes.

6            MR. BLANCHARD: Well, I think that's all I've got for

7  you right now. Thank you.

8            UPON EXAMINATION CONDUCTED BY MR. CARLOS MAHONEY:

9       Q.   Just a couple of follow-up, Mr. Sutton. Let's start

10 at the last one. From looking at your analyses of angles and

11 trajectories, is there any way for you to tell at what angle

12 he would have had to cock his wrist back in order for the

13 muzzle of the gun to be actually pointed toward the officer?

14      A.   Well, I mean, if you look at anything that shows the

15 first shot, which I guess we could look at Figure 21 or before

16 that, simpler Figure 20, Figure 19, it would have to be along

17 that red line, right, because that -- that's the position of

18 the two people. So it would be along the red line.

19      Q.   So --

20      A.   Look at page 18, for instance.

21      Q.   Okay.

22      A.   And I think we both talked about this. I think -- I

23 think 18 is off a little bit, that red line, but that's

24 basically what it would be.

25      Q.   Nineteen is up and --

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1      A.   Yeah, 19, page 18, Figure 19. Figure 19, yeah.

2      Q.   And the angle that you determine for the full

3 trajectory for the first shot, was it 35 degrees?

4      A.   Yes.

5      Q.   And so if he's running away, what would be the angle

6 that he would have to be cocking his wrist back in order to

7 face the muzzle towards the officer?

8      A.   So it would be whatever that angle is plus the 35,

9 so and I'm gonna estimate that that's like a 10 degree angle

10 that he's running. So a 45 degree angle.

11     Q.   Forty-five degree angle of his wrist facing towards

12 the officer as he's moving his arms back and forth?

13     A.   Yes.

14     Q.   Now you were asked questions about the videos and

15 you've used two videos, right? Both the original video along

16 with the enhanced video that the SBI did?

17     A.   Yes.

18     Q.   And is it fair to say that you can see images in the

19 enhanced video a little bit more clearly than you can the

20 original video.

21     A.   Yeah, it appears to be a little bit tighter

22 contrast, yes.

23     Q.   In terms of certain quality of videos, did you see a

24 bodycam video that Officer Mobley activated after the shooting

25 took place?

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1    A.   Yes.

2    Q.   And that's a video depicting Officer Mobley's actual

3    line of vision at that time, once he turned on his bodycam; is

4    that right?

5    A.   More or less. It's like a fisheye lens kind of video

6    camera.

7    Q.   It comes from the center of his body, more or less.

8    A.   Yes.

9    Q.   Okay. And in this case is it your understanding that

10   Officer Mobley did not turn on the bodycam video until after

11   the shooting took place?

12   A.   That is correct.

13   Q.   If he had turned it on before the shooting took

14   place, would that have had an even better viewpoint of what

15   the officer was seeing at the time when these events were

16   transpiring?

17   A.   Yes.

18   Q.   Better than a dashcam video.

19   A.   Yes.

20   Q.   And in your analysis, I believe you determined that

21   it took approximately 5.4 seconds from the point when Mr.

22   Pritchard stopped his vehicle to the point where his door

23   opened --

24   A.   Yes.

25   Q.   -- isn't that right? And in that 5.4 seconds, did it

Case 4:20-cv-00060-M   Document 31-4   Filed 05/28/21   Page 52 of 57

1   appear that Officer Mobley had the time and opportunity to

2   activate his bodycam video?

3       A.   Well, he -- he would have had the time to do it.

4   It's my understanding from his testimony is that when he was

5   at the point where he was gonna activate the camera, he was

6   also in the process of going for his weapon. So he couldn't do

7   both at the same time.

8       Q.   But he would have had sufficient time and

9   opportunity to have activated it before Mr. Pritchard opened

10  the door of his vehicle and got out.

11      A.   Yeah, he could have done it earlier, yes.

12      Q.   In terms of the analyses that you did from the video

13  and the photographs and the on-site analysis, did the SBI do

14  any of the time analyses, distance analyses, or bullet

15  trajectory analyses that you did?

16      A.   No.

17      Q.   So you have --

18      A.   At least I haven't seen them.

19      Q.   All right. You've not seen any evidence to that

20  effect, correct?

21      A.   Correct.

22      Q.   And so you have done original analyses of the time,

23  distance, angles and bullet trajectories.

24      A.   Yes.

25      Q.   And you mentioned that the first bullet, in your

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1  opinion, most likely struck his center mass and that would be

2  in his back?

3      A.   Yes.

4      Q.   And that the second bullet then most likely struck

5  him in the right buttock?

6      A.   Yes.

7      Q.   And in terms of the second shot, the video does not

8  depict where Mr. Pritchard was located at that point; is that

9  accurate?

10     A.   It is.

11     Q.   And so you tried to determine that location based

12 upon where he wound up, as shown in the bodycam footage, as

13 well as the still photographs that were done?

14     A.   Yes, and then you can also still see the officer at

15 the time the second shot is fired, so using all that and

16 that's how we came up with the range -- for the second shot,

17 we just had to do a range, which I think is 21. It's the

18 furthest potential location for the second shot, is Figure 21.

19     Q.   All right. Are all the opinions that you have

20 expressed in your report, as well as during this deposition,

21 truthful and accurate to the best of your knowledge?

22     A.   Yes.

23          MR. MAHONEY: That's all the questions.

24          ON EXAMINATION CONDUCTED BY MR. NORWOOD BLANCHARD,

25 III:

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1    Q.   I did have a follow-up based on Mr. Mahoney's

2  questions. Mr. Mahoney asked you to speculate a little while

3  ago about whether he could have turned on -- Mobley could have

4  turned on his bodycam.

5    A.   Yes.

6    Q.   I think you testified earlier this is a standard

7  car, right? The vehicle?

8    A.   Yes.

9    Q.   Driver's side is the left side.

10   A.   Yes.

11   Q.   You get out on the left-hand side.

12   A.   Yes.

13   Q.   So you use what, left hand for that?

14   A.   Yes.

15   Q.   Okay. If Officer Mobley is talking on the radio with

16  his right hand and uses his left hand to open the car door, in

17  the time you've got right here, and he's already -- I think

18  you established he's already out of his car ahead of the time

19  before the suspect gets out, right?

20   A.   Yes.

21   Q.   What hand does he use to turn on the bodycam?

22   A.   Well, it depends on what -- at what point in time. I

23  understand your question is is that he has time to turn it on,

24  but not during certain events in the sequence, if that makes

25  sense, to answer your question. You know, once he's out of the

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858

1  car and needing to go for his weapon, he doesn't --

2       Q.   It's not time, is there?

3       A.   Right. What I would say, maybe the way I would

4  summarize it is this, he had time to turn it on. I'm not

5  saying that he should have turned it on at any particular

6  time, if that makes sense.

7       Q.   I mean, we do have a video recording of this, right?

8       A.   Yes.

9       Q.   So the bodycam is the belt and suspenders approach,

10 not just the belt, right? If you're looking at it as an

11 officer here, this is being recorded by the dashcam, bodycam

12 is just something extra, isn't it?

13           MR. MAHONEY: Objection.

14      A.   Well, you can certainly derive a lot of information

15 from the dashcam. I mean, the bodycam would have been the

16 preferred view, just for all the reasons that we've talked

17 about. You know, clarity, position, 'cause you know, we're

18 sitting here trying to figure out okay, what exactly could the

19 officer see and that sort of thing. So the bodycam would be

20 better, better information, but that's not to say that you

21 can't take the dashcam and do what I did.

22      Q.   And I think it is accurate to say though you would

23 agree that once he got out of the car, there wasn't time to

24 turn a two-second body camera -- if you had to hold your hand

25 on it for two seconds, he would not have had time, right?

1      A.    Well, again, I mean, he -- he could have once he got

2  out of the car, too, but he might be wanting to do something

3  else at that time. I mean, really, those are questions that

4  are for him, right, because --

5      Q.    You're not offering an opinion on that.

6      A.    Right, he could have, you know, stood there for 10

7  seconds and turned his camera on while Mr. Pritchard was

8  running away. I mean, he had, physically he had time to do it,

9  it's just a matter of choice.

10         MR. BLANCHARD: Well, thank you.

11  * * * * * * * * * * * * * * * * * * * * * * * * * * * *

12            THE DEPOSITION CONCLUDED AT 2:39 P.M.

13

14

15

16

17

18

19

20

21

22

23

24

25

Carolina Court Reporters, Inc.
Greenville, North Carolina 27858