IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Case No. 4:20-CV-00060-M

| | | |
|---|---|---|
| TERESA PRITCHARD as Administrator of | ) | |
| the Estate of Cedric D. Pritchard, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| AARON M. MOBLEY, in his individual | ) | |
| capacity, and CITY OF WASHINGTON, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on Defendants' motion for summary judgment [DE 30] on the federal civil rights and state tort claims brought by Teresa Pritchard on behalf of her son's estate (the Estate). Qualified immunity bars the Estate's claim against Officer Mobley under 42 U.S.C. § 1983. Likewise, public official immunity bars the Estate's civil battery claim against Officer Mobley. This leaves no basis for holding the City of Washington (the City) vicariously liable for civil battery. Thus, the court grants Defendants' motion.

**I.    Background**

This civil rights action arises from the fatal shooting of Cedric Pritchard by Officer Aaron Mobley of the City of Washington Police Department on October 21, 2018.

**A. Procedural Background**

The Estate, through Teresa Pritchard, filed this action against Officer Mobley and the City on April 6, 2020 [DE 1]. The Estate sues Officer Mobley in his individual capacity under 42 U.S.C. § 1983, DE 1 ¶ 27, alleging that he violated Pritchard's Fourth Amendment rights by using excessive force,  DE 1 ¶¶ 58–67. The Estate also sues Officer Mobley in his individual capacity

under North Carolina law, DE 1 ¶ 28, alleging that he committed a civil battery, DE 1 ¶¶ 68–73. Finally, the Estate sues the City for civil battery under the doctrine of respondeat superior, DE 1 ¶¶ 30–31, alleging that Officer Mobley committed a civil battery within the course and scope of his employment, *see* DE 1 ¶¶ 74–75. Defendants answered [DE 13], pleading as defenses qualified immunity, public official immunity[1], and sovereign immunity.

Defendants moved for summary judgment on all claims under Federal Rule of Civil Procedure 56, arguing that (1) Officer Mobley acted reasonably or (2) official immunity doctrines bar the Estate's claims. *See* DE 30 at 1. The Estate responded [DE 41], arguing that genuinely disputed material facts preclude summary judgment. Defendants replied [DE 46].

### B. Findings of Fact

After making all reasonable inferences in the Estate's favor, the court finds that:

1. On October 21, 2018, Officer Aaron Mobley was employed as a Senior Patrol Officer with the City of Washington Police Department. DE 34-1 at 7.

**The Traffic Stop**

2. Just before 4:00 p.m. that afternoon, Officer Mobley saw a blue Pontiac Aztec drive past his patrol vehicle and turn onto Washington Street. *See* DE 34-1 at 116; DE 31-2 ¶¶ 5–7.

3. Officer Mobley recognized the driver as Cedric Pritchard. DE 31-2 ¶ 8.

---

[1] Defendants' answer refers to this defense as "public official immunity." DE 13 at 1. The Supreme Court of North Carolina and most opinions by the North Carolina Court of Appeals do the same. *See, e.g.*, *State ex rel. Stein v. Kinston Charter Acad.*, 379 N.C. 560, 588, 866 S.E.2d 647, 666 (2021); *Bartley v. City of High Point*, 272 N.C. App. 224, 846 S.E.2d 750, 754 (2020), *review denied*, 379 N.C. 160, 860 S.E.2d 918 (2021). Other opinions, including the *Turner* and *Cooper* decisions cited herein, refer to the same doctrine as "public officer's immunity" or "public officers' immunity." *See, e.g.*, *Turner v. City of Greenville*, 197 N.C. App. 562, 569, 677 S.E.2d 480, 485 (2009); *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013). This opinion uses "public official immunity" but understands these phrases all to refer to the same "'derivative form' of governmental immunity, which precludes suits against public officials in their individual capacities." *See Bartley*, 846 S.E.2d at 754.

4. He knew that someone else owned the Aztec, DE 31-2 ¶ 6, and that Pritchard lacked a valid driver's license, DE 31-2 ¶ 11.

5. Officer Mobley requested confirmation of the status of Pritchard's license as he drove around the block to wait for the Aztec. *See* DE 34-1 at 118–19; DE 34-18 at 14:48:06–14:48:27.

6. Pritchard continued down Washington Street, and Officer Mobley turned to follow him. *See* DE 34-1 at 119–20; DE 34-18 at 14:48:27–14:48:33.

7. Officer Mobley followed the Aztec for less than ten seconds before Pritchard braked and cut across the oncoming lane. *See* DE 34-18 at 14:48:30–14:48:38.

8. Pritchard stopped the Aztec in front of a multifamily home at 1105 Washington Street. *See* DE 34-18 at 14:48:38–14:48:45; DE 31-2 ¶ 17.

9. Officer Mobley activated his patrol vehicle's blue lights and parked one car length behind the Aztec. DE 34-1 at 120; DE 31-2 ¶ 18.

10. He believed reasonable suspicion supported the stop because Pritchard crossed the oncoming lane of traffic and parked on the left-hand curb. *See* DE 31-2 ¶ 19; DE 34-1 at 121.

11. Officer Mobley reported the traffic stop over his police radio. *See* DE 34-1 at 122–24.

12. He did not call for backup and was the only officer present. *See* DE 34-1 at 129.

13. He suspected Pritchard might try to run, *see* DE 34-1 at 123–24, because he stopped in a "sudden and unexpected" manner, DE 31-2 ¶21.

14. Still, he did not believe it was a "known risk" or "hot" traffic stop. DE 34-1 at 129.

**Officer Mobley's Knowledge About Pritchard at the Time of the Traffic Stop**

15. Officer Mobley had heard Pritchard was a felon from Officer Folk earlier that day but knew nothing else about his criminal history. *See* DE 34-1 at 94.

16. This conversation took place when Officer Mobley arrived at the stationhouse for his shift and found Officer Folk logging evidence from a shootout that had occurred the night before. *See* DE 34-1 at 91–93.

17. Officer Folk told Officer Mobley that he and the detective working the case suspected Pritchard was involved and had used a revolver based on bullets recovered from the scene. *See* DE 34-1 at 92.

18. Officer Folk also told Officer Mobley that the officers had not found anything when they searched Pritchard that night near the scene. *See* DE 34-1 at 94.

19. Officer Folk submitted an investigation report on the shooting that includes these observations, *see* DE 34-27, but Officer Mobley had not seen it, *see* DE 34-1 at 93.

20. Two nights prior, Officer Mobley responded to an armed robbery call. DE 34-1 at 87.

21. Pritchard was the only man at the scene wearing clothing matching the caller's description of the perpetrator. DE 34-1 at 87–88.

22. The alleged victim did not cooperate with the investigation, and Officer Mobley turned his attention to ticketing a drug offender without talking to Pritchard. *See* DE 34-1 at 88 ("I knew we didn't have nothing [sic] on [Pritchard].").

23. When he made the stop, Officer Mobley did not believe Pritchard was "armed or dangerous." *See* DE 34-1 at 129.

24. Nor did he believe that the police were "actively looking for [Pritchard] for any reason." DE 34-1 at 94.

**The Confrontation and Shooting**

25. Officer Mobley left his patrol vehicle and began walking toward the Aztec. *See* DE 34-1 at 126; DE 31-2 ¶ 24.

4

26. As Officer Mobley reached the front of his patrol vehicle, Pritchard opened the driver's side door of the Aztec. *See* DE 31-2 ¶ 24; DE 34-22 at 6–7, Figs. 7–8.[2]

27. At the instant he began opening the door, 5.4 seconds had passed since Pritchard stopped the Aztec. DE 34-22 at 11.

28. Pritchard jumped from the Aztec, facing back toward Officer Mobley. DE 34-22 at 7, Fig. 9.

29. As he did so, Pritchard extended his right arm out beyond the door. *Id.*

30. Officer Mobley saw a small, black pistol in Pritchard's right hand. DE 34-1 at 129–30; DE 31-2 ¶ 24; *see also* DE 34-22 at 7, Fig. 9 (superimposing a circle around this object).

31. Officer Mobley immediately reached for his service weapon upon seeing Pritchard's pistol. *See* DE 34-1 at 130; DE 31-2 ¶ 26.

32. Pritchard turned away from Officer Mobley and ran toward the residence. *See* DE 34-22 at 8–9, Figs. 11–12.

33. Pritchard swung his arms in a normal running motion without turning his right side back toward Officer Mobley. *See id.*; DE 34-1 at 134.

34. Pritchard did not point the muzzle of his pistol at Officer Mobley as he did so.

35. Officer Mobley fired his service weapon as Pritchard's right arm swung backward with the pistol in his hand. *See* DE 34-22 at 9, Figs. 12–13.

---

[2] These Figures present side-by-side frames from the original footage from the Officer Mobley's dash camera, DE 34-18, and the "enhanced" version prepared by the State Bureau of Investigation (SBI), DE 34-22 at 4. In each Figure, both frames display the timestamp visible on the original footage, but the "enhanced" frame also includes a superimposed timestamp specifying the tenth of a second. The Figures appear in the report prepared by the Estate's forensic expert, DE 34-22, and Officer Mobley relies on them in his Declaration, *see* DE 31-2 ¶ 34. The court relies on these Figures, rather than the original dash camera footage, for this portion of the encounter because they depict the events with greater clarity and precision.

36. Officer Mobley fired this shot approximately 1.3 seconds after he saw Pritchard emerging from the Aztec holding the pistol. *See* DE 34-22 at 7–9, Figs. 9, 13 (beginning with enhanced frame 00459 and depicting Officer Mobley's first shot in enhanced frame 00472).

37. Pritchard was just over twenty feet from Officer Mobley. DE 34-22 at 22.

38. In the next half-second, Officer Mobley took a step forward and fired a second shot. *See* DE 34-22 at 10, Fig. 14.

39. One bullet struck Pritchard in his back to the left of his spine and passed through his heart. *See* DE 34-26 at 2–4 (summarizing the medical examiner's autopsy findings).

40. The other bullet struck Pritchard in his right buttock. *Id.*

41. Officer Mobley does not know which bullet corresponds to which shot. *See* DE 34-1 at 191.

42. Pritchard fell to the ground near the front steps of the residence. *See* DE 34-19 at 15:53:25–15:53:41 (showing Pritchard on a paved walkway by the handrail).

43. A black revolver was found near where Pritchard fell. *See* DE 34-19 at 15:53:39 (showing the revolver in the grass by the walkway); *see also* DE 34-1 at 172 (estimating the revolver was roughly three feet away from Pritchard).

44. Pritchard died at the scene from the shot to his back. DE 34-10 at 6.

45. Officer Mobley did not call out Pritchard's name before firing. *See* DE 34-1 at 136 (testifying that he cannot remember if he did so).

46. Officer Mobley did not give a verbal command to stop or drop the weapon or a warning that he was about to shoot. DE 34-1 at 136.

47. Officer Mobley saw an elderly person open the door of 1105 Washington Street after the shooting but does not remember seeing anyone in the area at the time of the shooting. *See* DE 34-1 at 148.

6

48. Officer Mobley did not activate his body camera until at least one minute after the shooting. *See* DE 34-1 at 128, 143; DE 31-2 ¶ 33.

## II.    Summary Judgment under Federal Rule of Civil Procedure 56

Normal summary judgment rules apply to excessive force claims. *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). The question remains whether any material facts are genuinely disputed. *See id*. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). Courts must view the evidence in the light most favorable to the nonmovant. *See id.*

When the nonmovant bears the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court[]that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant does so, the burden shifts to the nonmovant to point out "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In doing so, "the [nonmovant] must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *Celotex Corp.*, 477 U.S. at 324. Inadmissible hearsay cannot create a factual dispute. *Stanton*, 25 F.4th at 237 n.7.

Although these standards are well-established, deadly force cases can present "special difficulties." *Id.* at 234. Because the witness most likely to contradict the officer cannot testify, courts "should be careful . . . to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence." *See id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). That said, courts should not give "especially critical" treatment to officer testimony or relax the "genuine" dispute requirement. *See id.* ("Speculation alone cannot create a factual dispute.").

## III.   Discussion

This traffic stop turned tragic in little more than an instant. As Officer Mobley approached, Pritchard jumped from the Aztec with a pistol in his hand. Not two seconds later, Pritchard had been shot twice and fatally wounded. The acts underlying the Estate's action—Pritchard turning and running, Officer Mobley drawing and firing—all happened at once.

It is in "the heat of [that] moment" that the court must evaluate Officer Mobley's split-second decision. *See id.* at 233. The facts found above frame the events in the light most favorable to the Estate. Having drawn those inferences, the court determines whether the facts establish that Officer Mobley (1) used unreasonable force and (2) violated a clearly established right. *See id*. The Fourth Circuit splits the burdens of proof for this two-pronged inquiry. *See id.* at 233 (citing *Henry v. Purnell,* 501 F.3d 374, 377–78 & n.4 (4th Cir. 2007)). Plaintiffs bear the burden of proving a violation under the first prong and defendants bear the burden of proving their entitlement to qualified immunity under the second prong. *See id.* Both prongs present pure questions of law. *See Henry v. Purnell*, 652 F.3d 524, 531, 534 (4th Cir. 2011) (en banc) (describing both objective reasonableness inquiries); *Ray v. Roane*, 948 F.3d 222, 228 (4th Cir. 2020) (addressing inquiries into clearly established law). Both questions must be answered in the Estate's favor to defeat summary judgment. *See Henry,* 501 F.3d at 377–78; *see also Pearson v.*

8

*Callahan*, 555 U.S. 223, 232, 236 (2009) (allowing courts to decide which prong to address first under the circumstances). The next subsections explain the factual findings and apply them to this two-pronged liability inquiry.

### A. No Genuine Dispute of Material Fact Exists

The Estate argues that factual disputes preclude summary judgment. *See* DE 41 at 1–2. No material matter is genuinely disputed. In other words, Defendants are entitled to judgment as a matter of law because resolving the genuinely disputed matters in the Estate's favor does not change this case's disposition. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Officer Mobley's observation that Pritchard was armed is material but not genuinely disputed. Deadly force generally will be unreasonable when an officer confronts an unarmed suspect fleeing on foot. *See Scott v. Harris*, 550 U.S. 372, 383 (2007) (citing *Tennessee v. Garner*, 471 U.S. 1, 21 (1985)). Officer Mobley testifies that he saw a pistol in Pritchard's right hand. DE 31-2 ¶ 24. The Estate contends Officer Mobley first saw the pistol after the shooting, *see* DE 33 ¶¶ 11, 13, 32, and suggests Pritchard's hands were empty as he ran, *see* DE 33 ¶ 13 (citing DE 38, DE 39) (citing hearsay statements that Pritchard had nothing in his hands). The Estate has not, however, identified reliable record evidence to support these contentions.

The competent evidence corroborates Officer Mobley's account. Enhanced images from the dash camera footage show a dark object in Pritchard's right hand as his upper body emerges from the Aztec*, see* DE 34-22 at 7, Fig. 9 (circling this object), and as Officer Mobley fired his first shot, *see* DE 34-22 at 9, Fig. 13 (same). The Estate's forensic expert agrees that this object appears to be the same size as the revolver found near where Pritchard fell. *See* DE 31-4 at 29–31; *see also* DE 34-19 at 15:53:39 (showing a small, dark revolver in the grass near Pritchard). All agree that Officer Mobley had a closer view of Pritchard's hand than the dash camera in his

patrol vehicle. *See* DE 33 ¶ 19; DE 31-4 at 32. Even if that video evidence does not *confirm* Officer Mobley's account, it is at least consistent with his testimony.

The same cannot be said of the witnesses on whose statements the Estate relies. Linwood Austin and Michael Floyd told an SBI agent that Pritchard had nothing in his hands as he ran. DE 38 at 16; DE 39 at 10. This court cannot adopt as factually accurate accounts contradicted by the video evidence showing a small, dark object in Pritchard's right hand as he jumped and ran. *See Scott*, 550 U.S. at 380–81. In any event, the Estate cannot create a genuine factual dispute by relying on hearsay statements from these interviews. *See Stanton*, 25 F.4th at 237 n.7. Defendants challenge the Estate's reliance on these unsworn statements, *see* DE 46 at 5, and the Estate has not explained the admissible form it anticipates presenting, *see Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538–39 (4th Cir. 2015), *as amended* (June 24, 2015) (quoting Fed. R. Civ. P. 56, 2010 Advisory Committee Note).

Nor has the Estate put Officer Mobley's knowledge about Pritchard in genuine dispute. Officer Mobley testifies that Officer Folk told him Pritchard was a felon suspected of participating in a shootout the night before. *See* DE 34-1 at 91–92, 94–95. The Estate argues only that Officer Mobley has "not presented corroborating evidence" to support this testimony. DE 33 ¶ 8. Even if Officer Mobley had to do so, Officer Folk's contemporaneous investigation report corroborates his recollections. *See* DE 34-27 at 2, 4 (identifying Pritchard as a "suspect" but recording that they found no weapons when they searched him walking away from the scene of the shootout). Nothing suggests Officer Folk to be untrustworthy, and the law does not require that Officer Mobley independently verify Officer Folk's representations before relying on them. *See generally White v. City of Greensboro*, 408 F. Supp. 3d 677, 711 (M.D.N.C. 2019) (collecting cases permitting

applications for search warrants based on information supplied by fellow officers without further inquiry).

In the same way, the Estate does not establish a genuine dispute about whether Pritchard was a suspect in an alleged armed robbery two days before the shooting in this case. Officer Mobley testifies that he saw Pritchard in clothing matching the description of the alleged perpetrator when he responded to the armed robbery call *See* DE 34-1 at 87–88. A reasonable jury taking the facts in the Estate's favor would also consider Officer Mobley's acknowledgment that they had "nothing on" Pritchard at the time. *See* DE 34-1 at 88 (explaining that the alleged victim did not cooperate). Even so, the same jury would have no basis for rejecting Officer Mobley's testimony about Pritchard being the only person at the scene matching that description.

The Estate does establish genuine disputes about two factual matters, but neither meets the materiality threshold required to defeat summary judgment. The parties disagree over whether Pritchard was running or jogging. They also disagree about whether he was pointing his pistol at Officer Mobley. The court addresses these disputes in turn.

The Estate contends that Pritchard was running rather than moving at some slower speed. Officer Mobley testifies that most fleeing suspects sprint while Pritchard seemed to be trying "to buy some time to see what he was gonna do." *See* DE 34-1 at 167 (agreeing with the characterization of Pritchard's pace as "a jog"). The Estate's forensic expert estimates Pritchard's travel speed was 7.3 miles per hour and asserts that is "significantly faster than a walk or jog." DE 34-22 at 16–17. A reasonable jury could find that Pritchard was "running" from the Aztec toward the residence.

The parties also disagree about what Officer Mobley saw Pritchard doing as he ran. Officer Mobley testifies that he saw the muzzle of Pritchard's pistol pointed back at him when he pulled the trigger. *See* DE 31-2 ¶¶ 27–28. The Estate challenges his assertion on two grounds.

First, the Estate notes that Officer Mobley's account has evolved since the shooting. *See* DE 33 ¶¶ 31. His statements at the scene, *see* DE 34-19 at 15:54:23–15:54:27, and to the SBI, *see* DE 37 at 13, describe Pritchard turning back as if to shoot. Later, Officer Mobley testified that Pritchard did *not* turn his body, *see* DE 34-1 at 132–34, but pointed the gun back toward him as he ran, *see id.*; *see also* DE 31-2 ¶¶ 27–28. The Estate argues these inconsistencies call Officer Mobley's credibility into question—at least as to this point. *See* DE 33 ¶ 31.

Second, the Estate argues that forensic evidence casts doubt on Officer Mobley's claim that he saw the muzzle of Pritchard's pistol when he fired. *See* DE 33 at 10. Pritchard held the pistol in his right hand as he ran. *See* DE 34-22 at 9, Fig. 12. Officer Mobley fired from behind Pritchard's left shoulder. *See* DE 34-22 at 21, Fig. 21. All now agree that Pritchard's arms swung in a normal running motion and that he did not turn his right side back. *See id.*; DE 34-1 at 134. The Estate's forensic expert estimates that Pritchard would have had to cock his right wrist at a 45-degree angle behind his back as he ran for Officer Mobley to see the muzzle of his pistol. *See* DE 31-4 at 50–51.

This forensic evidence does not disprove Officer Mobley's account and the jury could make nothing of the inconsistencies the Estate emphasizes. But, as the Fourth Circuit recently explained in *Stanton*, the totality of such evidence could also permit the jury to find that Pritchard did not point the pistol at Officer Mobley. *See* 25 F.4th at 236 (addressing similar arguments about the officer's account being "at least in tension" with forensic evidence and his earlier statements). At the summary judgment stage, the court must assume it would do so.

Nevertheless, resolving that genuine dispute about Pritchard pointing his pistol in the Estate's favor does not change the disposition of this case. The Fourth Circuit has long recognized deadly force to be reasonable if an armed suspect points his gun at the officer. *See Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996). It refused, however, to adopt the inverse proposition—that deadly force against an armed suspect is unreasonable if he does not point his gun at the officer. *See Cooper v. Sheehan*, 735 F.3d 153, 159 n.9 (4th Cir. 2013) ("To be clear, an armed suspect need not engage in some specific action—such as pointing, aiming, or firing his weapon—to pose a threat."). The possibility that a jury might reject Officer Mobley's proffered explanation for firing does not preclude summary judgment because his subjective motivations have "no role" in the objective legal determinations here. *See Henry*, 652 F.3d at 535. In other words, a factual finding that Pritchard pointed his pistol at Officer Mobley may be sufficient to show entitlement to summary judgment but is not necessary to do so. The next subsection explains that the asserted right was not clearly established even absent this finding.

**B.  Qualified Immunity Bars the Estate's Excessive Force Claim under § 1983**

Officer Mobley can only be held liable if (1) the Estate establishes that a violation occurred and (2) Officer Mobley does not establish his entitlement to qualified immunity. *See Stanton*, 25 F.4th at 233. Under *Pearson*, the court exercises its discretion to proceed directly to the second prong. *See* 555 U.S. at 236. The inquiry ends here as Officer Mobley is at least entitled to qualified immunity. That is, even if Officer Mobley used excessive force, then-existing law did not clearly establish that shooting Pritchard under the circumstances violated the Fourth Amendment.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right." *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (internal quotation marks omitted). Put simply, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v.*

*Hughes*, 138 S. Ct. 1148, 1152 (2018). Because the inquiry focuses on whether Officer Mobley had "fair notice that [his] conduct was unlawful," reasonableness is judged against the law as it stood on October 21, 2018. *See id.* That legal backdrop includes decisions by the Supreme Court, Fourth Circuit, and Supreme Court of North Carolina. *See Ray,* 948 F.3d at 229.

The inquiry asks about "the violative nature of particular conduct," *see Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), so the Supreme Court has repeatedly admonished lower courts not to define clearly established law at a high level of generality, *Kisela*, 138 S. Ct. at 1152. "[S]pecificity is especially important in the Fourth Amendment context" given the difficulties the officer faces when determining how the legal doctrine of excessive force will "apply to the factual situation [he] confronts." *See id.* An officer facing novel factual circumstances can be expected to use common sense to draw analogies or logical inferences, *see Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019), but the prior holdings must place the unconstitutionality of his actions "beyond debate," *see Kisela*, 138 S. Ct. at 1152.

The Estate alleges Officer Mobley violated Pritchard's Fourth Amendment right to be free from excessive force. *Garner* establishes that deadly force may be used to prevent a suspect's escape if the officer has probable cause to believe that he poses a threat of serious physical harm to the officer or others. *See id.* (citing 471 U.S. at 11). The officer must also give a warning before using deadly force unless there is an "immediately threatened danger." *See Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573, 584 (4th Cir. 2017) (citing *Garner*, 471 U.S. at 11– 12) (explaining *Garner's* feasibility condition). Courts should pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Kisela*, 138 S. Ct. at 1152 (quoting *Graham*

14

*v. Connor*, 490 U.S. 386, 396 (1989)). While these "general statements of law are not inherently incapable of giving fair and clear warning to officers," *Garner* and *Graham* "do not by themselves create clearly established law outside an obvious case." *See id.* at 1153 (internal quotation marks omitted).

Officer Mobley shot Pritchard in the back without giving a verbal warning, so the inquiry asks whether every reasonable officer would have understood that Pritchard did not pose an immediate threat of serious physical harm to the officer or others under the circumstances. The circumstances include that Pritchard (1) was the subject of a lawful traffic stop, (2) had just jumped out in front of an approaching officer holding a pistol, and (3) ran away toward a residence without pointing the pistol at the officer when (4) the officer knew he was a felon prohibited from possessing firearms and (5) had reason to suspect he had recently engaged in gun violence. No decision had decided these facts or set a clear rule resolving them. Nor had any analogous decisions moved the use of deadly force under these circumstances out from the "unsettled peripheries of the law." *See Williams*, 917 F.3d at 770. Officer Mobley is thus entitled to qualified immunity.

To start, these circumstances have not been addressed by any binding decision cited by the parties or found by the court. Even framed in general terms—for example, using deadly force against an armed fleeing felon—the question is unsettled. Consider the Fourth Circuit's recent statement in *Estate of Jones by Jones v. City of Martinsburg, West Virginia*, 961 F.3d 661 (4th Cir. 2020).[3] The panel held that it was clearly established in 2013 that officers could not use deadly

---

[3] *Estate of Jones* includes a parenthetical stating that *Henry* holds that "shooting a 'fleeing, nonthreatening misdemeanant' was unlawful, even when that suspect had a firearm." *See* 961 F.3d at 670 (citing 652 F.3d at 534). However, the suspect in *Henry* was not armed, 652 F.3d at 527,

force against an armed suspect who was secured and incapacitated. *See id.* at 671. It supported this conclusion, in part, by noting that the man officers encountered walking in the street "was not an armed felon on the run." *See id.* To be sure, *Estate of Jones* does not go so far as to say that deadly force would have been reasonable had he—like Pritchard—been an armed felon fleeing from officers. That said, drawing this contrast would make little sense if it had also been clearly established in 2013 that deadly force was unreasonable under those more threatening circumstances. At the very least, *Estate of Jones* evidences a lack of clarity about the use of deadly force against armed fleeing felons at a relevant time.

Turning to cases addressing suspects possessing firearms, the Fourth rejected two general rules that would have settled this question in *Cooper*. On the one hand, *Cooper* holds that a reasonable officer could not use deadly force against Pritchard merely because he possessed a firearm. 735 F.3d at 159. On the other hand, *Cooper* refused to condition the reasonable use of deadly force against an armed suspect like Pritchard on his "engag[ing] in some specific action— such as pointing, aiming, or firing his weapon." *See id.* at 159 n.9 (clarifying that the opinion's language about being "threatened with the weapon" imposes no such requirement). Instead, *Cooper* recognizes that "[p]ursuant to *Tennessee v. Garner* and its progeny, there are many circumstances under which a police officer could reasonably feel threatened." *Id.*

Without a decision or rule directly on point, the question becomes whether commonsense inferences or analogies from holdings about other circumstances put the unconstitutionality of Officer Mobley's actions beyond debate. *See Williams*, 917 F.3d at 770. Given the fact-driven

---

nor was he reasonably suspected of being armed when the officer shot him, *see id.* at 532 & n.9. Instead, *Henry* resolves an unrelated issue—the objective unreasonableness of an officer mistakenly firing his service weapon instead of his taser as he tried to apprehend an unarmed misdemeanant. *See id.* at 533–34.

nature of the objective reasonableness inquiry, *Scott* cautions courts against venturing too far afield in search of such guidance. *See* 550 U.S. at 383. Several decisions address officers shooting suspects who had not pointed firearms at them but were at least reasonably believed to be armed. Officer Mobley acted in an unsettled area beyond these cases and therefore receives qualified immunity's protection. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

Conclusions about less threatening circumstances in *Cooper, Pena,* and *Hensley* do not control here. *Cooper*, like the Fourth Circuit's earlier unpublished opinion in *Pena v. Porter*, 316 F. App'x 303 (4th Cir. 2009), involved a homeowner "bearing a firearm while investigating a nocturnal disturbance on his own property." *See* 735 F.3d at 159–60. Both suspects were shot without warning as they stepped out onto their porches, unaware that officers approached outside. *See Cooper*, 735 F.3d at 155, 159; *Pena*, 316 F. App'x at 307. Although *Hensley* involved a more chaotic encounter, *see generally* 876 F.3d at 588–90 (Shedd, J., dissenting), the decision emphasizes its "noteworthy resemblance to" *Cooper*. 876 F.3d at 583. The majority determined that, at the moment force was used, the suspect lawfully possessed a firearm he pointed at the ground and had disobeyed no law enforcement directives as he stepped off his porch toward the deputies. *See id.* at 583–84. The Fourth Circuit held that officers acted unreasonably by firing in each of these cases, but the encounter here can be distinguished on a number of relevant grounds.

Several facts suggest Officer Mobley faced more threatening circumstances. To start, Pritchard did not lawfully possess the pistol. Nor was he moving calmly about his own property. Instead, he was running toward someone else's residence after drawing an illegal firearm. He did so in front of an approaching officer as the subject of what was at least an attempted seizure. *See* DE 31 ¶ 7 (asserting Pritchard was the subject of a traffic stop); DE 33 ¶ 7 (admitting the same); *cf. United States v. Stover*, 808 F.3d 991, 997–99 (4th Cir. 2015) (citing *Brendlin v. California*,

551 U.S. 249, 255 (2007)) (determining that a defendant who exited a stopped car was not "seized" by the approaching officers until he complied with commands to drop his gun). In short, this was not another case in which deadly force was unreasonable because the officer "had no reason to suspect that [Pritchard] posed an immediate threat other than the fact that he was holding a gun that was not pointed at [him]." *Cf. Hensley*, 876 F.3d at 585 (citing *Cooper*, 735 F.3d at 159).

Nor does the reasoning of decisions holding that officers reasonably used deadly force against apparently armed suspects who violated their commands clearly establish that Officer Mobley acted unconstitutionally. *Hensley's* explanation of *Anderson v. Russell* suggests that the reasonableness of shooting a suspect who reached for a suspicious bulge in his waistband turned on the officer's repeated commands that he keep his hands up. *See id.* (citing 247 F.3d 125, 130–32 (4th Cir. 2001)). Similarly, an earlier unpublished opinion found it "[c]rucial[]" that the officer who shot a suspect who pulled a gun from his waistband had ordered him to keep his hands on the hood of the patrol car during the frisk. *See Ayala v. Wolfe*, 546 F. App'x 197, 201 (4th Cir. 2013) (unpublished). Relatedly, the Fourth Circuit emphasized that the deputies in *Hensley* had given no commands, stating that "[i]f an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions." *See* 876 F.3d at 585. None of these suspects raised firearms at the officers. *See id.* at 200; *Hensley*, 876 F.3d at 585–86 (citing *Anderson*, 247 F.3d at 131). Even if these cases could be read as conditioning the reasonable use of deadly force on the suspects' violations of commands, that requirement would not put this case beyond dispute.

Pritchard violated what amounts to a nonverbal command to remain in or at least with his vehicle. Activating blue lights has been equated with "command[ing a person] to halt" in other Fourth Amendment contexts. *See Strover*, 808 F.3d at 995 (citing *Michigan v. Chesternut*, 486

U.S. 567, 575–76 (1988)) (including these in the same list of actions that "communicate[ ] to the reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement").[4] No reasonable person would have felt free to run from Aztec. *See id.* While *Hensley* referred to a "verbal command" to stop or drop the gun, Pritchard's flight following Officer Mobley's show of authority is the sort of defiance that could support an inference of threatening intentions. *See* 876 F.3d at 585.

It also remains unclear whether a verbal warning would have been feasible under these circumstances. Officers generally must give warnings before using deadly force but need not do so when they face immediately threatened dangers. *See id.* at 584 (citing *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994). Then-existing law on this point requires triangulation between different results reached under distinguishable circumstances. Right after another officer yelled "[t]he man has got a gun," the officer in *McLenagan* turned and shot a detainee who was "in full flight, virtually upon him." *See* 27 F.3d at 1007 (noting that the officer did not see the detainee holding a gun); *see also id.* at 1005 n.5 (accepting that the approaching detainee had come within "five to ten feet" of the officer). The Fourth Circuit held that "imminent danger" obviated the need for a warning. *See id.* at 1007. In contrast, *Hensley* held that deputies should have given a warning before shooting a visibly armed suspect who was approaching more slowly from a greater distance. *See* 876 F.3d. at 585; *see also id.* at 592 (Shedd, J., dissenting) (noting that "[l]ess than fifteen

---

[4] The deputies in *Hensley* approached the suspect's house in marked vehicles, and the suspect knew they were law enforcement officers. *See* 876 F.3d at 589 (Shedd, J., dissenting). Neither the Fourth Circuit nor trial court opinion states that the deputies activated their blue lights or sirens at any point before firing. *Cf. Hensley v. Suttles*, 167 F. Supp. 3d 753, 759 (W.D.N.C. 2016), *aff'd sub nom. Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573 (4th Cir. 2017) ("When the deputies drove up in their vehicles, the decedent looked out the front windows. Decedent saw the police cars and then walked from the front room of the house into his bedroom followed by Rachelle.") (internal citations omitted).

seconds had elapsed from the time the officers pulled into the driveway until the time the shots were fired" and that the suspect was "within 30 feet"). These cases set no "bright lines" barring a reasonable officer from shooting a visibly armed suspect without warning approximately one second after he jumped from a stopped car and started running toward a residence. *See Maciarello*, 973 F.3d at 298.

The result would be different if Pritchard's turning and running eliminated the threat, but no case clearly established that principle. As the Estate notes, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." DE 41 at 8 (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)). But *Waterman's* statements about the ongoing danger posed by an apparently unarmed suspect fleeing in a car do not speak to this situation. The initial shots fired in *Waterman* were reasonable because the suspect driving toward the officers "was well positioned to seriously injure or kill one or more of them with his vehicle—possibly within a fraction of a second—if they did not employ deadly force." *See* 393 F.3d at 480. The driver no longer presented such a threat after passing the officers. *See id.* at 482 (holding that they acted unreasonably by continuing to fire). *Waterman* does not, however, address the possibility that an armed suspect fleeing on foot could still turn back to shoot "within a fraction of a second." Nor does *Waterman* address the threat to others presented by an armed suspect running toward a residence. Indeed, the difficulty of drawing comparisons across these contexts led the Supreme Court to reject inferred rules restricting the use of force in *Scott*. *See* 550 U.S. at 382–83 (reasoning that *Garner's* statements about foot chases had "scant applicability" to a case involving a car chase because of their "vastly different facts").

Qualified immunity precludes Officer Mobley being held liable for a split-second decision in a constitutional grey area. *See Maciariello*, 973 F.2d at 298. He pleads qualified immunity as

a defense, DE 13 at 1, and the facts establish his entitlement to its protection, *see Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003) (explaining what the defendant must show under his burden to prevail at summary judgment). The court need not resolve the overlapping questions this encounter raises as their very existence precludes liability. This case presents the situation the Supreme Court had in mind when *Pearson* permitted proceeding directly to the second prong of the inquiry: one in which "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *See* 555 U.S. at 237. Courts must avoid surprising officers with liability in these "unsettled peripheries of the law." *See Williams*, 917 F.3d at 770. Thus, the court grants Officer Mobley's motion for summary judgment on the Estate's § 1983 claim.

### C. Public Official Immunity Bars the Estate's Battery Claim Against Officer Mobley

The analogous public official immunity doctrine bars the Estate's civil battery claim against Officer Mobley for the same reasons. North Carolina law protects police officers from suit in their individual capacities unless they act outside the scope of their authority, maliciously, or corruptly. *See Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003). The Estate alleges Officer Mobley acted within the scope of his role, DE 1 ¶ 74, and does not suggest he acted for his own personal benefit. Malice thus stands as the only potentially applicable exception. *See, e.g.*, *Wilcox v. City of Asheville*, 222 N.C. App. 285, 288–89, 730 S.E.2d 226, 230 (2012) (limiting this inquiry's scope for the same reason).

The Estate argues Officer Mobley violated Pritchard's clearly established rights and acted maliciously. *See* DE 41 at 21. *Cooper* explains that these arguments are one and the same. *See* 735 F.3d at 160 (equating violating a clearly established right with doing what "a man of reasonable intelligence would know to be contrary to his duty"). Inasmuch as the analysis of public official immunity under North Carolina law is "functionally identical" to the federal

qualified immunity analysis above, *see id.*, the same result follows for this state law tort claim. Public official immunity bars the Estate's battery claim against Officer Mobley in his individual capacity. Thus, the court grants Officer Mobley's motion for summary judgment on the Estate's civil battery claim against him.

### D. No Basis Remains for the Estate's Battery Claim Against the City

The Estate's civil battery claim against the City cannot proceed without the civil battery claim against Officer Mobley. The City's liability under respondeat superior for Officer Mobley's actions depends on an underlying tort claim against him. *See Turner v. City of Greenville*, 197 N.C. App. 562, 568, 677 S.E.2d 480, 484 (2009); *see also Prior v. Pruett*, 143 N.C. App. 612, 621, 550 S.E.2d 166, 172 (2001)) (explaining that similar tort claims against a local government were "derivative of and dependent on" the resolution of the claims against the officer). Because public official immunity bars the only battery claim against Officer Mobley, the derivative liability claim against the City cannot proceed either.[5] *See Turner*, 197 N.C. App. at 569, 677 S.E.2d at 485 ("[W]e hold that the officers involved in this case would be entitled to public officer's immunity based on Plaintiffs' forecast of evidence, which includes no proof of malicious, corrupt or ultra vires conduct by the officers. Because a negligence claim against the officers would not survive on Plaintiffs' forecast of evidence, a claim of negligence against the [municipality] can[]not be supported.") (internal quotation marks omitted). Thus, the City is also entitled to summary judgment.

---

[5] The Estate does not sue Officer Mobley in his official capacity. *See* DE 1 ¶¶ 27–28; *cf. Lee v. Town of Seaboard*, 863 F.3d 323, 330 n.7 (4th Cir. 2017) (quoting *Lowder v. Payne*, 226 N.C. App. 201, 739 S.E.2d 627, 2013 WL 1121330, at *5 (N.C. Ct. App. 2013) (unpublished table opinion)) ("When the trial court applied the public official immunity doctrine to Payne, it absolved him of individual liability only. However, plaintiff's actions against Payne in his official capacity for ordinary negligence remain intact, thereby providing the foundation necessary to support plaintiff's actions against the City.").

## IV.     Conclusion

Under the circumstances, Officer Mobley's actions did not violate any clearly established constitutional right.   Qualified immunity thus bars the Estate's § 1983 claim against Officer Mobley.   For the same reasons, public official immunity bars the Estate's civil battery claim against Officer Mobley.   That holding deprives the Estate of the foundation necessary to hold the City liable for civil battery under the doctrine of respondeat superior.   Thus, the court GRANTS Defendant's motion for summary judgment [DE 30] and directs the Clerk of Court to close this case.

SO ORDERED this 30th day of March, 2022.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE